OPINION OF THE COURT
Jones, J.
We hold that an entry made for the purpose of effecting a felony arrest within the home of the person to be arrested by a police officer who has entered without permission of the owner, if based on probable cause, is not necessarily violative of the constitutional right to be secure against unreasonable searches and seizures even though the arresting officer has not obtained a warrant and there are no exigent circumstances.
Defendant Theodore Payton has been convicted on a jury’s verdict of the felony murder of a service station manager in connection with an armed robbery committed on the morning of January 12, 1970 by a man carrying a rifle and wearing a ski mask, who fled the scene with the weapon and cash following the homicide. Two days later, on January 14, two eyewitnesses to the crime — both of whom had known defendant — identified him to the police as the killer. One of the witnesses also furnished defendant’s address. On the morning of January 15 about 7:30 a.m., without having first secured a warrant, the detective in charge of the investigation went with three other detectives and a police sergeant to defendant’s apartment. Although they observed a light shining beneath the door and heard a radio playing, there was no answer when they knocked. To open the locked metal door they summoned officers from the Emergency Service Department, who arrived about a half hour later and with the aid of crowbars forced open the door. The police entered the apartment, checked the rooms for defendant who was not found, observed a .30 caliber shell casing in plain view on top of a stereo set and then conducted a full-scale search of the apartment, which revealed a shotgun with ammunition in a closet and a sales receipt for a Winchester rifle and photographs of defendant with a ski mask in a dresser drawer. The following day defendant surrendered himself to the police and was subsequently indicted on charges arising out of the service station homicide.
Following a pretrial suppression hearing, the court, on concession by the District Attorney, suppressed all of the items found in the apartment with the exception of the shell *306 casing. The suppression court held that the casing had been inadvertently observed while the police were lawfully in the premises to make a warrantless arrest for a felony which they had reasonable grounds to believe defendant had committed.[1]
During the trial the People produced testimony that two .30-30 Winchester discharged shell casings had been found at the scene of the crime and that those shells and the .30 caliber shell casing found in defendant’s apartment had been fired from the same rifle. They also called as a witness the owner of a sporting goods store in Peekskill, New York, the store which had issued the rifle sales receipt seized at the time of defendant’s arrest but suppressed prior to trial. He testified that on November 19, 1969 he had sold a .30-30 Winchester rifle and shells to a man who identified himself as Theodore Payton. There was also introduced in evidence the Federally required Firearm Transaction Record retained by the seller which bore defendant’s signature. The defense objected to both the testimony and the exhibit as inadmissible "tainted fruit” of the unlawful seizure of the suppressed sales receipt. The objections were overruled and, after a posttrial hearing on defendant’s motion to set aside the verdict on the ground that the evidence at trial was the product of material which had been ordered suppressed, the motion was denied. The Appellate Division affirmed defendant’s conviction of felony murder.
*307 Defendant Obie Riddick has been convicted of criminal possession of a controlled substance in the sixth degree on his plea of guilty following denial of his motion to suppress a quantity of narcotics and a hypodermic syringe taken from a dresser drawer in his home when he was arrested there on March 14, 1974 for the commission of two armed robberies which had occurred in 1971. In June, 1973 the victims had identified defendant from a photograph as the perpetrator of the robberies. Following that identification, the detective investigating the robberies contacted defendant’s parole officer and in January, 1974 learned his address. Without having procured an arrest warrant, about noon on March 14, 1974 the detective, two other detectives and the parole officer went to the house where defendant was living. After the parole officer had entered the house, determined that defendant was present and so signaled the waiting policemen, the detective investigating the robberies knocked on the door, which was opened by defendant’s three-year-old son. Through the open door the detective observed defendant in the bedroom sitting in bed covered to the waist by a sheet. Entering the apartment with one of the other officers, the detective announced his authority and asked defendant if he was Obie Riddick. Defendant acknowledged his identity and was told that he was under arrest, advised of his rights and instructed to get out of bed. When it then became apparent that defendant was dressed only in his underwear and that he would have to dress, the detective searched the bed, a chest of drawers two feet from the bed and the defendant’s clothing. In doing so he found a quantity of narcotics and a hypodermic syringe in the top drawer of the chest. After indictment for the crimes of criminal possession of a controlled substance in the fifth degree and criminal possession of a hypodermic instrument defendant moved to suppress the drugs and syringe, contending that the arrest had been unlawful because it had been made without a warrant and without announcement by the police of their purpose before entering defendant’s home.[2] The *308 motion was denied after a hearing, the suppression court finding that the arrest was lawful because it was based on probable cause and that the search conducted incidental to the arrest was reasonable and did not exceed the limits set out in Chimel v California (395 US 752). Defendant’s contentions were not explicitly addressed. A plea of guilty to a reduced charge in satisfaction of the indictment followed the denial of suppression. The conviction was affirmed at the Appellate Division.
In each of these cases we are confronted with the claim that evidence, the introduction or availability of which may be regarded as critical to defendants’ convictions, should have been suppressed because it had been unlawfully procured, that is, seized after an entry into defendant’s home to make an arrest without either the authority of a previously issued warrant or the existence of exigent circumstances, in violation of constitutional protections. In Payton the challenge is to the .30 caliber shell casing found on defendant’s stereo set which —matching those found at the service station — may well have contributed to identify defendant as the killer in the jury’s eyes; in Riddick it is to the narcotics and hypodermic syringes, denial of suppression of which prompted defendant’s plea of guilty. In Riddick reliance is also placed on the absence of compliance with a statutory requirement of prior announcement of the police officers’ authority and purpose.
The parties to these appeals have extensively briefed the question whether, without infringement of constitutional rights, an arrest may be made within the residence of a defendant based on unquestionable probable cause — as each of these arrests was — without a warrant in the absence of exigent circumstances. Not insubstantial arguments are mounted in support both of an affirmative and a negative response to the question, and multiple supporting authorities are offered on each side. It is contended by defendants that physical *309 invasion of the home is the "chief evil against which the wording of the Fourth Amendment is directed” (United States v United States Dist. Ct., 407 US 297, 313); that it has been conclusively determined that, absent exigent circumstances (of which there were none here), an otherwise proper warrantless entry of the home to search for property is impermissible (Coolidge v New Hampshire, 403 US 443); that the sanctity of the home is equally invaded when entry is made for the purpose of arrest; that the more serious consequences of the latter class of entry provide a more compelling reason to require the authority of a warrant in such a situation (United States v Reed, 572 F2d 412; Accarino v United States, 179 F2d 456) — in sum, that if a warrant or exigent circumstances is required for a search and seizure, any proper sense of constitutional symmetry would mandate that the same predicate be required for an arrest.
The People, for their part, assert the existence of an established difference between entry in a home to effect an arrest and one to search and seize property (as to which they agree that a warrant is required in the absence of exigent circumstances), and urge that a proper regard for public safety permits — even demands — recognition of a right in a peace officer to enter a home for the purpose of arresting one who the officer has reasonable grounds to believe has committed a felony, without the necessity for obtaining a warrant, even though there be no exigent circumstances. They contend that the right to make such an arrest, as an alternative to arrest 'tyith a warrant, has been recognized both at common law before the adoption of the constitutional provisions and since their adoption, and that such procedure is presently authorized by explicit legislation in at least 30 States, including New York, as well as by the Model Code of Pre-Arraignment Procedure promulgated by the American Law Institute (§ 120.6, subd [1]).
The parties also draw the conflicting inferences (which others have similarly drawn) from holdings and writings of the Supreme Court of the United States and its individual Justices. Defendants infer from United States v Watson (423 US 411) that an arrest following a warrantless entry in the home is invalid; the People conclude from Ker v California (374 US 23) that the contrary is the case. The fact is that the Supreme Court has not yet resolved the issue, as appears from the explicit statement in the plurality opinion in Watson that *310 the question " 'whether and under what circumstances an officer may enter a suspect’s home to make a warrantless arrest’ ” is "still unsettled” (423 US, at p 418, n 6). Nor has the issue been resolved in our court. In determining now that the warrantless arrests effected in these cases did not violate defendants’ constitutional rights to be free from unreasonable searches and seizures, we rely both on what we perceive to be a substantial difference between the intrusion which attends an entry for the purpose of searching the premises and that which results from an entry for the purpose of making an arrest, and on the significant difference in the governmental interest in achieving the objective of the intrusion in the two instances.
In the case of the search, unless appropriately limited by the terms of a warrant, the incursion on the householder’s domain normally will be both more extensive and more intensive and the resulting invasion of his privacy of greater magnitude than what might be expected to occur on an entry made for the purpose of effecting his arrest. A search by its nature contemplates a possibly thorough rummaging through possessions, with concurrent upheaval of the owner’s chosen or random placement of goods and articles and disclosure to the searchers of a myriad of personal items and details which he would expect to be free from scrutiny by uninvited eyes. The householder by the entry and search of his residence is stripped bare, in greater or lesser degree, of the privacy which normally surrounds him in his daily living, and, if he should be absent, to an extent of which he will be unaware.
Entry for the purpose of arrest may be expected to be quite different. While the taking into custody of the person of the householder is unquestionably of grave import, there is no accompanying prying into the area of expected privacy attending his possessions and affairs. That personal seizure alone does not require a warrant was established by United States v Watson (423 US 411, supra), which upheld a warrantless arrest made in a public place. In view of the minimal intrusion on the elements of privacy of the home which results from entry on the premises for making an arrest (as compared with the gross intrusion which attends the arrest itself), we perceive no Sufficient reason for distinguishing between an arrest in a public place and an arrest in a residence. To the extent that an arrest will always be distasteful or offensive, there is little reason to assume that arrest within the home is *311 any more so than arrest in a public place; on the contrary, it may well be that because of the added exposure the latter may be more objectionable.
At least as important, and perhaps even more so, in concluding that entries to make arrests are not "unreasonable”— the substantive test under the constitutional proscriptions — is the objective for which they are made, viz., the arrest of one reasonably believed to have committed a felony, with resultant protection to the community. The "reasonableness” of any governmental intrusion is to be judged from two perspectives — that of the defendant, considering the degree and scope of the invasion of his person or property; that of the People, weighing the objective and imperative of governmental action. The community’s interest in the apprehension of criminal suspects is of a higher order than is its concern for the recovery of contraband or evidence; normally the hazards created by the failure to apprehend far exceed the risks which may follow nonrecovery.
The apparent historical acceptance in the English common law of warrantless entries to make felony arrests (2 Hale, Historia Placitorum Coronae, History of Pleas of Crown [1st Amer ed, 1847], p 92; Chitty, Criminal Law [3d Amer, from 2d London, ed, 1836] 22-23), and the existence of statutory authority for such entries in this State since the enactment of the Code of Criminal Procedure in 1881[3] argue against a holding of unconstitutionality and substantiate the reasonableness of such procedure. In People v Samuel (29 NY2d 252, 264) we said: "While antiquity is not an infallible criterion for *312 determining the scope of constitutional rights, traditional usage and understanding is helpful in defining the privilege against self incrimination.” That rationale is even more persuasive when we are determining "reasonableness” — a quality, not always constant, which reflects and derives substance from the standards and mores of the time and the society.
Nor do we ignore the fact that a number of jurisdictions other than our own have also enacted statutes authorizing warrantless entries of buildings (without exception for homes) for purposes of arrest.[4] The American Law Institute’s Model Code of Pre-Arraignment Procedure makes similar provision in section 120.6, with suggested special restrictions only as to nighttime' entries. The accompanying commentary states: "To go further and require a warrant or a showing of necessity before police may make a felony arrest on private property even in daytime seems unduly restrictive. Moreover, apart from the specially alarming quality of nighttime entries and apart from search considerations, it is far from clear that an arrest in one’s home is so much more threatening or humiliating than a street arrest as to justify further restrictions on the police.” (American Law Institute, Model Code of Pre-Arraignment Procedure [1975], p 307).
For these reasons and in the absence of an explicit determination by the Supreme Court which would permit us no alternative, we hold that the entries made by the police in the cases before us did not violate defendants’ constitutional protections against unreasonable searches and seizures. In reaching this conclusion we are not unmindful of considered decisions in the Federal courts which have reached an opposite result (e.g., United States v Reed, 572 F2d 412, supra; United States v Killebrew, 560 F2d 729).
We turn then to the other contentions made in Payton. First, it is argued that the true purpose of the police officers who entered defendant’s apartment was not to make an arrest but rather to conduct a full-blown search of the premises, in which event the plain view doctrine would not be applicable and the shell casing too should have been suppressed. The determination of the officers’ purpose, however, turned on a question of fact, the resolution of which was dependent on the credibility ascribed by the hearing Judge to the testimony of *313 the entering officer. That factual issue, having been resolved in favor of the People by the suppression court and affirmed at the Appellate Division, is now beyond review by this court.
Next, Payton renews his challenge to the admissibility of the testimony of the Peekskill sporting goods store owner and of the latter’s gun sale record as tainted fruit of the initial unlawful seizure of the gun sale receipt which occurred when defendant’s apartment was illegally searched. To refute defendant’s claim that, but for the seizure of the sales receipt, the prosecution would not have gained access to the testimony or the record, the People assert (as the trial court found after the posttrial hearing) that the allegedly tainted evidence was admissible under the so-called "inevitable discovery” doctrine (cf. People v Fitzpatrick, 32 NY2d 499). Defendant responds that the factual situation here was insufficient to support the application of that doctrine. The evidence, however, is to the contrary.
 In the first place the label "inevitable discovery” is inaccurate and therefore misleading. The doctrine does not call for certitude as the literal meaning of the adjective "inevitable” would suggest. What is required is that there be a very high degree of probability that the evidence in question would have been obtained independently of the tainted source. The proof in this case meets that standard and supports the finding of the Trial Judge at the posttrial hearing. Second, any and every application of the doctrine of inevitable discovery will inescapably be exposed to the observation that the police did not in fact pursue the inevitable course to discovery.
The investigating detective testified that, because the murder weapon was never recovered, proof of defendant’s ownership of a gun such as that used in the killing was of critical importance. The detective knew that the weapon used was a Winchester rifle. He also testified that he had learned from a friend and hunting companion of defendant that the latter had purchased such a gun in "upstate New York” in November, 1969. He further stated without contradiction — and this was critical in this instance — that it was "normal police procedure” in investigations such as this to communicate with the Tobacco, Alcohol and Firearms Unit of the United States Treasury Department, which maintains a list of all gun shops, and then to send out communications to and to make personal contacts with such shops in an effort to locate the weapon *314 sought.[5] He stated that in this instance he would have followed this procedure and would have inquired of gun stores, which would have included the one in Peekskill. Inquiry at the Peekskill store would have led directly to defendant because of the records of all gun sales maintained under Federal requirement. In corroboration the owner of the Peeks-kill store testified that he maintained the required records of gun sales and that he was accustomed to checking his records when police inquiries were made. The Trial Judge found that the People had established "that normal police investigative techniques would have uncovered the Peekskill gun dealer” and thus that "the unlawful seizure of the bill of sale was not a sine qua non of the discovery” of the seller. We agree.[6]
Finally, it is asserted that defendant was deprived of his constitutional right to represent himself at his trial. The exercise of this right requires an unequivocal request to proceed pro se (People v McIntyre, 36 NY2d 10, 17), which was lacking in this case. Statements made by defendant as to his being his own lawyer were associated with references to discharging his assigned counsel and securing new representation and were always overshadowed by applications for adjournments and postponements for reasons which he declined to divulge. At no time did he demonstrate an actual fixed intention and desire to proceed without professional assistance in his defense to the charges against him.
It remains only briefly to address the other contention advanced in Riddick — that the police entry was statutorily invalid for the failure of the police officers to give notice of their authority and purpose prior to their entry to make the arrest. The requirement that such notice be given before breaking into a building to obtain access to effect an arrest is of ancient vintage and serves the purpose of providing the person within an opportunity to respond to the demand for admittance, thus obviating the need for forcible entry (Miller v United States, 357 US 301). The statement of the purpose demonstrates the inapplicability here of the statutory section *315 in effect at the time in question which codified the common-law requirement.[7] In Riddick the purpose of the notice requirement was accomplished when, in response to the investigating officer’s knock, defendant’s infant son opened the door, and promptly on entering the officers declared their authority and their purpose to arrest defendant. What is determinative is that the entry was peaceable. No forcible entry was necessary or effected and no prejudice resulted from the officers’ failure to give notice outside the open door.
Accordingly, for the reasons stated, the order of the Appellate Division in each case should be affirmed.

. Sections 177 and 178 of the Code of Criminal Procedure, in effect at the time of this entry, provided:
"§ 177. In what cases allowed.
"A peace officer may, without a warrant, arrest a person,
"1. For an offense, committed or attempted in his presence, or where a police officer as enumerated in section one hundred fifty-four-a of the code of criminal procedure, has reasonable grounds for believing that an offense is being committed in his presence.
"2. When the person arrested has committed a felony, although not in his presence;
"3. When a felony has in fact been committed, and he has reasonable cause for believing the person to be arrested to have committed it;
"4. When he has reasonable cause for believing that a felony has been committed, and that the person arrested has committed it, though it should afterward appear that no felony has been committed, or, if committed, that the person arrested did not commit it;
"5. When he has reasonable cause for believing that a person has been legally arrested by a citizen as provided in sections one hundred eighty-five, one hundred eighty-six and one hundred eighty-seven of this code.”
"§ 178. May break open a door or window, if admittance refused.
"To make an arrest, as provided in the last section, the officer may break open an outer or inner door or window of a building, if, after notice of his office and purpose, he be refused admittance.”

. CPL 140.15 provides with respect to arrest without a warrant: "4. In order to effect such an arrest, a police officer may enter premises in which he reasonably believes such person to be present, under the same circumstances and in the same manner as would be authorized, by the provisions of subdivisions four and five of section 120.80, if he were attempting to make such arrest pursuant to a warrant of arrest.”
Subdivisions 4 and 5 of section 120.80 provide:
"4. In order to effect the arrest, the police officer may, under circumstances and in a *308 manner prescribed in this subdivision, enter any premises in which he reasonably believes the defendant to be present. Before such entry, he must give, or make reasonable effort to give, notice of his authority and purpose to an occupant thereof, unless there is reasonable cause to believe that the giving of such notice will:
"(a) Result in the defendant escaping or attempting to escape; or
"(b) Endanger the life or safety of the officer or another person; or
"(c) Result in the destruction, damaging or secretion of material evidence.
"5. If the officer is authorized to enter premises without giving notice of his authority and purpose, or if after giving such notice he is not admitted, he may enter such premises, and by a breaking if necessary.”

. Sections 177 and 178 of that statute provided as follows:
"§ 177. * * *
"A peace officer may, without a warrant, arrest a person,
"1. For a crime, committed or attempted in his presence;
"2. When the person arrested has committed a felony, although not in his presence;
"3. When a felony has in fact been committed, and he has reasonable cause for believing the person to be arrested to have committed it”.
"§ 178. * * *
"To make an arrest, as provided in the last section, the officer may break open an outer or inner door or window of a building, if, after notice of his office and purpose, he be refused admittance.”
These sections remained unchanged, except for expansion of the grounds for warrantless arrest provided in section 177 by amendments in 1960, 1963 and 1967, until replaced by the Criminal Procedure Law on September 1, 1971. The substance of the provisions was continued and expanded in sections 140.10, 140.15 (subd 4) and 140.25 (subds 1-3) of the present statute.

. American Law Institute, Model Code of Pre-Arraignment Procedure (1975) Commentary, Appendix XI.

. When the cross-examiner resorted to the "reductio ad absurdum”, the officer readily admitted that he had never known any such inquiry to include every gun shop in the State. There was, however, no contradiction of his testimony as to the normal police procedure in making such investigations.

. As to the possible alternative ground for reaching this conclusion, namely, that the testimony of the keeper of the gun shop was admissible under the attenuation rule with respect to the testimony of live witnesses, see People v Mendez (28 NY2d 94) (compare, also, United States v Ceccolini, 435 US 268).

. CPL 120.8 (subd 5) (supra, n 2).