Fuchsberg, J.
(dissenting). No court is pleased with the prospect that the "criminal is to go free because the constable has blundered” (People v De Fore, 242 NY 13, 21 [Cardozo, Ch. J.]). But that sentiment must yield to the fundamental precept of our jurisprudence that even the guiltiest of men is entitled to the fullest protection of the laws (Brewer v Williams, 430 US 387, 406).[1] To that end, it needs no repeating that the general rule is that evidence produced by illegal police action should not be admitted in evidence, the purpose being "to deter — to compel respect for the constitutional guarantee in the only effectively available way — by removing the incentive to disregard it” (Elkins v United States, 364 US 206, 217; People v Allende, 39 NY2d 474, 477). For the reasons which follow, we would hold that the product of the illegal arrest should have been suppressed and the case dismissed.
We start with the premise, found by the Appellate Division and undisputed by this court, that, at a time when he had done "nothing to arouse even the slightest suspicion”, the defendant was unlawfully seized by the police in violation of the Fourth Amendment. And, as the majority opinion itself points out, the actions of the police in moving him by car and in ordering him to keep his hands exposed were an integral part of this unwarranted arrest. It also agrees that, if the defendant’s act of discarding and thereby revealing his possession of a gun was a direct consequence of his unlawful arrest, the evidence is tainted and must be suppressed.
Resolution of this case turns then on the question of *406 whether the discovery of the weapon was "induced” by the illegal arrest (see People v Munger, 37 AD2d 950, app dsmd 33 NY2d 576) or whether the connection between the two events was so attenuated as to dissipate the taint (Wong Sun v United States, 371 US 471, 487, quoting Nardone v United States, 308 US 338, 341). Put another way, was there any break in the chain of events which would purge the illegality? (Cf. People v Chapple, 38 NY2d 112; People v Stephen J. B., 23 NY2d 611, 615; Brown v Illinois, 422 US 590). There is none to be found.
The rapid sequence of events here — the order to get into the car, the removal from the scene, the command to keep his hands where they could be seen, the attempt to dispose of the weapon — leads inexorably to only one conclusion: the defendant, no longer in control of his freedom or privacy, reacted spontaneously to rid himself of the weapon which he obviously believed he no longer had the power to keep to himself. There is no other rational explanation. He did not disgorge the gun to oppose or attack or escape from the police (see People v Townes, 41 NY2d 97); its discard put it beyond use for such purposes. Moreover, police inquiry as to whether the defendant was "clean”, followed in rapid fire order by instructions as to the placement of his hands and by an announcement that he was being taken to the nearest police station, not only contributed to the detention but were also of a nature to induce a reflexive apprehension that, if the defendant did not rid himself of the weapon, more serious consequences of the illegal arrest were imminent.
Spontaneity and immediacy of a reaction contraindicate deliberation or planning. There simply is not time for either. And, such a reaction is sure to be at least as predictable as one that was actually planned. Furthermore, it is bound to meet any test of foreseeability or proximate cause. Aside from its spontaneity, the reaction here was certainly immediate. Indeed, it was as immediate as immediate can be. Eighth Avenue blocks in Manhattan are only 200 feet long. The police car had transported the defendant less than half a block between the point at which he entered the vehicle and the. place where it was brought to a halt after the police saw the weapon being discarded. Even a slow-moving automobile will take only seconds to traverse under 100 feet. Indeed, if the car here had been proceeding at a speed of but 10 miles per hour, the reaction and braking time that elapsed between *407 the observation of the movement of the defendant’s hand and the time the vehicle actually stopped would alone have had to eat up a fifth of that distance. The remaining space of somewhat less than 80 feet would be covered in no more than five seconds, less than the time it takes to write this phrase.[2]
In short, the interval between the warning about the hands and the discard of the weapon could have been no more than a twinkling of time. Together with the directness of its connection to the illegality, it admitted of no possible attenuation. For all practical purposes, on the uncontradicted facts, spontaneity and attenuation had merged.
It is in the face of these facts that, as a reason for denying suppression, the majority offers the argument that, since the police had no prior knowledge that the defendant was carrying a weapon and the unlawful arrest was not designed to accomplish that end, "the purpose of the exclusionary rule would not be served by suppressing the seized evidence”. With all due respect, by no means can I accept that proposition. The arrest was both deliberate and unlawful. It was just the kind of conduct the exclusionary rule was intended to deter. If the sanction does not operate to confiscate the avails, whether they were the particular ones sought by the offending officers or not, the rule would be no more than a paper tiger. For it was not the defendant’s almost inevitable response, but the illegal police conduct, against which the rule was directed.
Nor does the majority’s contention withstand analysis when measured by other doctrine we have enunciated. Only recently, we held that an arrest, as a major intrusion into an individual’s privacy, subsumes the right to search the person as well (People v De Santis, 46 NY2d 82). And, not too long ago, we reiterated that an unlawful search will not lead to suppression if it is inevitable that the police would have discovered the evidence by lawful means (People v Fitzpatrick, 32 NY2d 499; People v Payton, 45 NY2d 300; People v Riddick, 45 NY2d 300). Similarly, once the defendant here was seized, it was to be expected that in due course he would have *408 been "patted down” or searched more fully as a matter of routine, if only to secure the arresting officers from danger. This inevitably would have disclosed the weapon. In that event, because of the illegality of the arrest, it would have to have been suppressed. Yet, there would have been no more or less of a police "design” in the discovery of the weapon in those circumstances than there was in the ones that actually unfolded here. In either instance, had the defendant’s liberty not been curtailed, the police would never have been in a position to discover the weapon (cf. People v Spinelli, 35 NY2d 77).
In sum, the "discovery” of the gun was clearly a direct and immediate product of the illegal arrest and, therefore, should be suppressed (cf. People v Baldwin, 25 NY2d 66, citing Fletcher v Wainwright, 399 F2d 62; People v Loria, 10 NY2d 368).
Chief Judge Cooke and Judges Gabrielli and Jones concur with Judge Wachtler; Judge Fuchsberg dissents and votes to reverse in a separate opinion in which Judge Jasen concurs.
Order affirmed.

. Looking at it from a different perspective, but to the same goal, it has been said that "good police work is something far different from catching the criminal at any price. It is equally important that the police, as guardians of the law, fulfill .their responsibility to obey its commands scrupulously. For 'in the end life and liberty can be as much endangered from illegal methods used to convict those thought to be criminals as from the actual criminals themselves’ ” (Brewer v Williams, 430 US 387, 407 [Marshall, J., concurring], supra, quoting Spano v New York, 360 US 315, 320-321).

. According to figures based on tests performed by the US Bureau of Public Roads, under normal road conditions a motor vehicle proceeding as slowly as 10 miles per hour travels 15 feet per second. The minimum stopping distance of a vehicle traveling at that speed is 19 feet, including 11 feet covered during reaction time and 8 feet after the brakes are fully applied (Sportsmanlike Driving, published for the American Automobile Association by Webster Division of the McGraw-Hill Book Co. [6th ed, 1970], p 61, table 6-1).