**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Hoyt Albert GAULTNEY, Defendant-Appellant.**

**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Gary Keith STEAGALD, Defendant-Appellant.**

**Nos. 78–5329, 78–5416.**

United States Court of Appeals, Fifth Circuit.

Nov. 13, 1979.

---

Albert M. Horn, Atlanta, Ga., for defendant-appellant in 78–5329.

Robert A. Boas, Asst. U. S. Atty., Atlanta, Ga., for U. S. in both cases.

P. Bruce Kirwan, Federal Public Defender, J. Richard Young, Asst. Public Defender, Atlanta, Ga., for defendant-appellant in 78–5416.

William L. Harper, U. S. Atty., Atlanta, Ga., for U. S. in 78–5416.

Before THORNBERRY, CLARK and KRAVITCH, Circuit Judges.

CHARLES CLARK, Circuit Judge:

Hoyt A. Gaultney and Gary K. Steagald were convicted of possessing cocaine in violation of 21 U.S.C. § 841(a)(1), and with conspiracy to possess cocaine with the intent to distribute in violation of 21 U.S.C. § 846. Additionally, Gaultney was convicted of the unlawful importation of cocaine in violation of 21 U.S.C. § 952(a). They appeal, raising a variety of issues. We affirm.

Gaultney and Steagald argue first that the original entry by local police and federal agents into the premises in which cocaine subsequently was found was unlawful, in that the entry was neither pursuant to a search warrant nor justified by probable cause and exigent circumstances. The evidence shows that on January 4, 1978, Special Agent Joseph Rassey of the Federal Drug Enforcement Administration [DEA] in Detroit, Michigan, was contacted by a confidential informant. The informant advised that he might be able to locate "Ricky Lyons," whom he believed to be wanted by the DEA, and another individual named "Jimmy," whom he believed to be wanted on state drug charges in Georgia. The informant advised that "Jimmy" currently was using the alias "Carl James." Additionally, the informant stated that he had known both of these individuals personally.[1] Agent Rassey did not know the status of either individual, but because this informant's information had been reliable in the past,[2] Rassey told the informant to call as

---

1. Special Agent Rassey testified that the confidential informant had known "Jimmy" and Ricky Lyons for a number of years and had spoken to "Jimmy" in the Detroit area during or just before Christmas 1977.

2. Special Agent Rassey testified that he had known the informant for approximately four or five years, that the informant had furnished reliable information to the DEA in the past, and that on the basis of such information seven

soon as the individuals were located at a definite spot. On Saturday evening, January 14, 1978, Rassey received a telephone call from the informant advising that he had spoken with "Jimmy" by telephone and had been given a telephone number in the Atlanta, Georgia, area where "Jimmy" and Ricky Lyons would be within the next twenty-four hours.[3] The informant gave this telephone number to Rassey, who, in turn, gave it to Special Agent Kelly Goodowens of the DEA's Savannah, Georgia, District Office on Monday, January 16. Goodowens was aware that one Richard Harrison Lyons, a/k/a "Ricky" Lyons, had been indicted six months earlier in the Southern District of Georgia, in a marijuana smuggling case. Upon further investigation, Goodowens determined that an arrest warrant had been issued for Lyons and that the DEA still listed Lyons as a fugitive. Thereafter, Goodowens contacted the telephone company and learned that the telephone number provided by Agent Rassey's informant was listed to a Richard E. Fisher at a rural address in Buford, Georgia.

On Monday, January 16, 1978, Rassey received another telephone call from his informant, who advised that a recent telephone conversation with "Jimmy" confirmed his presence at the telephone number previously given Rassey by the informant. The informant also stated that Ricky Lyons was at the same location, noting that he had heard Lyon's voice in the background during his telephone conversation with "Jimmy." Rassey had several other telephone conversations with the informant between January 16 and the morning of January 18. Each time the informant confirmed that "Jimmy" and Ricky Lyons were still at the location of the telephone number. The informant also advised Rassey that several other people would be with Lyons at the location. This information was passed along to Goodowens by Rassey in a series of telephone conversations, the last taking place on the morning of Wednesday, January 18, 1978.

On the afternoon of January 18, Goodowens and DEA Agents Wayne Smith and James Williams, after consulting with a telephone company installer and local police, located the address to which the telephone number was listed. On driving past the house, these agents observed a Volkswagen parked in the driveway and smoke coming from the chimney of the house. No people were observed outside in the vicinity of the house or automobile. Approximately thirty minutes later, after coordinating plans for the execution of the arrest warrant on Ricky Lyons, Agents Goodowens, Smith, and Williams led a force of approximately twelve federal agents and local police officers to the residence. Upon approaching the house, Goodowens and Smith noticed two men located near the rear of the parked Volkswagen, which now had its engine cover up. Smith at first believed one of the men to be Ricky Lyons, but, upon realizing he was not, continued toward the house. One of the two men, later identified as Gaultney, was armed. Both Gaultney and the other man, later identified as Steagald, were detained pending Smith's return from the house.

Agent Smith arrived at the house and knocked on the front door. Gaultney's wife, Cathy, answered the door. Smith advised Mrs. Gaultney that he was a police officer with an arrest warrant. He asked to come into the house and was admitted. Smith told Mrs. Gaultney he had an arrest warrant for Ricky Lyons and asked if Lyons was in the house. Mrs. Gaultney stated that there was "no one by that name" in the house. Smith then told Mrs. Gaultney to place her hands on the wall and asked Detective Conway to watch her.

drug-related arrests had occurred. Rassey further testified that three convictions had been obtained in those cases and that four cases were pending. Counsel for Gaultney admitted at oral argument that the past reliability of the confidential informant was not at issue.

3. Special Agent Rassey testified that: "On the day the informant called me and said he had received a phone number from Jimmy, and it was a number where Jimmy and Ricky were going to be within the next twenty-four hours."

Smith began a sweep search of the premises.

Agent Smith walked down a short hall to his right and looked first in a bathroom situated between two bedrooms. Seeing no one in the bathroom, but observing a light coming from under the door to the front bedroom on his right, he opened the door and entered. Immediately inside Smith observed a small table upon which was a set of triple beam balance scales, a clear plastic bag containing a white powder, and a box containing a roll of clear plastic bags. Smith completed the sweep search of the premises without locating Lyons. He returned outside to advise the other officers of what he had discovered in the house. Agent Goodowens then entered the house and, upon entering the front bedroom, saw the scales, the bag of white powder, and the roll of plastic bags on a small table, together with what appeared to be more bags of white powder partially visible inside a green garbage bag lying in an open suitcase on the bed. Approximately fifteen minutes later, Agent Smith left for Atlanta to obtain a search warrant for the house. Upon obtaining a warrant, Smith telephoned the agents who had remained at the house and advised them of the existence of the warrant.

About this time, a truck occupied by a man and woman arrived at the house. Based on information obtained from appellant Gaultney, the agents believed the truck to contain "Jimmy," the state fugitive about whom Rassey's informant had spoken. This individual immediately was detained on his entry to the house and initially declined to identify himself any further than his first name of Jimmy. Later, the individual produced a North Carolina driver's license bearing the name "Carl James." That evening, the individual was identified as James Albert Smith, who was wanted by state authorities on drug charges.

4. The search revealed a clear plastic bag containing 450 grams of 45% pure cocaine hydrochloride, two suitcases containing 8,394 grams of 99% pure cocaine hydrochloride and 10,445 grams of 95% pure cocaine hydrochloride re-

A subsequent search of the house conducted pursuant to the warrant obtained by Agent Smith revealed a variety of narcotics processing paraphernalia and some 43 pounds of almost pure cocaine.[4]

■ The law of this circuit is settled that "when an officer holds a valid arrest warrant and reasonably believes that its subject is within premises belonging to a third party, he need not obtain a search warrant to enter for the purpose of arresting the subject." *United States v. Cravero*, 545 F.2d 406, 421 (5th Cir. 1976), *cert. denied sub nom. Miller v. United States*, 429 U.S. 1100, 97 S.Ct. 1123, 51 L.Ed.2d 549 (1977), *and cert. denied*, 430 U.S. 983, 97 S.Ct. 1679, 52 L.Ed.2d 377 (1977). *See United States v. James*, 528 F.2d 999, 1017 (5th Cir. 1976), *cert. denied sub nom. Henry v. United States*, 429 U.S. 959, 97 S.Ct. 382, 50 L.Ed.2d 326 (1977); *Rodriguez v. Jones*, 473 F.2d 599, 605–06 (5th Cir.), *cert. denied*, 412 U.S. 953, 93 S.Ct. 3023, 37 L.Ed.2d 1007 (1973). As stated in *Cravero*, the test properly is framed in terms of the officer's reasonable belief.

> Reasonable belief embodies the same standards of reasonableness [as does probable cause] but allows the officer, who has already been to the magistrate to secure an arrest warrant, to determine that the suspect is probably within certain premises without an additional trip to the magistrate and without exigent circumstances.

545 F.2d at 421.

■ A review of the facts in this case discloses that a valid warrant for the arrest of Richard Harrison Lyons, a/k/a "Ricky" Lyons was outstanding and that first-hand information from a reliable informant established that Lyons recently had been and was believed still to be in the dwelling containing the telephone. Based on these facts, the agents had objective grounds for forming a reasonable belief that the fugi-

spectively, a box of clear plastic bags, two sets of Ohaus triple beam balance scales, and a bag containing beta-manitol, a common cutting agent for cocaine.

tive was present at the premises in question when they entered. *United States v. James,* 528 F.2d at 1017; *Rodriguez v. Jones,* 473 F.2d at 606. Having such a reasonable belief, the agent's warrantless entry of the premises was proper. *United States v. Cravero,* 545 F.2d at 421. The fact that the fugitive named in the arrest warrant was not found to be present on the premises at the moment of entry does not render the entry invalid. *United States v. James,* 528 F.2d at 1017; *United States v. Hofman,* 488 F.2d 287, 289 (5th Cir. 1974).

Counsel refers this court to the cases of *Payton v. New York* and *Riddick v. New York,* recently we argued at the Supreme Court.[5] There, New York State statutes authorizing the entry of a suspect's home in the absence of exigent circumstances to effect the suspect's *warrantless arrest* are challenged as being violative of the fourth amendment. These cases, and the issue thus presented to the Supreme Court, are inapposite to the issue before this court today. Today, we apply the reasonable belief standard announced in *Cravero* where the entry occurs to execute an existing, valid arrest warrant.

■ Gaultney and Steagald further argue that the refusal of the district court to order the government to provide their expert witness with a primary reference sample[6] for use in an independent laboratory analysis constitutes a denial of due process of law. This court has held that

> Fundamental fairness is violated when a criminal defendant on trial for his liberty is denied the opportunity to have an expert of his choosing, bound by appropriate safeguards imposed by the Court, ex-

amine a piece of critical evidence whose nature is subject to varying expert opinion.

*Barnard v. Henderson,* 514 F.2d 744, 746 (5th Cir. 1975). *See* F.R.Crim.P. 16(a)(1)(C). In cases involving a controlled substance, courts have held a concomitant part of the examination or inspection to be the right of the accused to have an independent chemical analysis performed on the seized substance. *See, e. g., United States v. Pollock,* 402 F.Supp. 1310, 1312 (D.Mass.1975); *United States v. Acarino,* 270 F.Supp. 526, 528 (E.D.N.Y.1967). *See also, United States v. Sullivan,* 578 F.2d 121, 124 (5th Cir. 1978). Our inquiry, therefore, focuses on whether the refusal of the district court to order the government to provide the defendant's expert with a primary reference sample placed an unreasonable restriction on the defendant's right to an independent analysis so as to deny him due process of law.

The facts disclose that the parties agreed that the independent analysis of the seized substance would be conducted at the Georgia State Crime Laboratory [GSCL] in Atlanta, Georgia. The GSCL has and enforces a policy of not supplying visiting independent examiners with a primary reference sample of controlled substances. Testimony from a government witness stated that the GSCL adheres to this policy for three reasons. First, independent examiners who are licensed to possess controlled substances are allowed by law to possess their own primary reference samples. *See generally* 21 U.S.C. §§ 821–24; 21 C.F.R. § 1301; Ga.Code Ann. §§ 79A–813 to –816. Second, those independent examiners not so licensed can purchase "exempt standards"[7] from

5. The Court of Appeals of New York affirmed the defendants' convictions in these cases. *People v. Payton,* 45 N.Y.2d 300, 408 N.Y.S.2d 395, 380 N.E.2d 224 (1978). On appeal, the United States Supreme Court noted probable jurisdiction. 439 U.S. 1044, 99 S.Ct. 718, 58 L.Ed.2d 703 (1978). The cases were argued on March 26, 1979, 47 U.S.L.W. 3651 (U.S. April 3, 1979) and subsequently were restored to the calendar for reargument. —— U.S. ——, 99 S.Ct. 2049, 60 L.Ed.2d 658 (1979). The cases were reargued on Oct. 9, 1979. See 48 U.S.L.W. 3251–52 (U.S. Oct. 16, 1979); 48 U.S.L.W. 3267 (U.S. Oct. 23, 1979) (Nos. 78–5420, –54).

6. A primary reference sample is a sample of the drug in question, here cocaine hydrochloride, whose quality and purity are known.

7. An exempt standard is a mixture containing a controlled substance, here cocaine hydrochloride, that is prepared for laboratory, industrial, educational or special research purposes and is packaged in such a manner, combination, quantity, proportion, or concentration so as not to present a potential for abuse. *See* 21 C.F.R. §§ 1308.23–.24.

various private manufacturers. Third, various analytical chemistry techniques utilizing instruments available at the GSCL allow an analysis of an unknown compound without the use of a reference sample, either primary or exempt.

Gaultney and Steagald make no showing that the policy of the GSCL prevented their expert from conducting an independent analysis to show that the seized substance was not cocaine. The record indicates that the expert never availed himself of the opportunity to examine the seized substance to determine whether he could make an independent analysis of its contents. Despite never previously having attempted an analysis using an exempt standard, the expert testified that any tests he might run restricted by the GSCL guidelines would yield results inferior to those obtained by the government's tests. This contention was vigorously disputed by the testimony of the GSCL Senior Forensic Chemist. In light of this conflicting testimony, there was no error in the trial court's determination that the GSCL policies regarding primary reference samples are reasonable. They did not operate to deprive appellants of due process of law.

■ Steagald additionally argues that the evidence produced at trial was insufficient to prove the requisite knowledge and intent to sustain his convictions. The evidence produced at trial shows that on September 16, 1977, Steagald contacted the Able-1 Answering Service in Atlanta, Georgia, to arrange a telephone answering service for the Rosen Import Company, Inc. A written agreement for such services was executed on behalf of Rosen Import Company by "G. K. Steagald (mgr.)." Able-1 subsequently received a check from Rosen Import Company, signed by G. K. Steagald, in payment for services rendered. On January 12, 1978, Steagald executed a lease agreement for warehouse space at 100–D Mill Street in Lawrenceville, Georgia. Steagald leased the warehouse in his own name and paid the first month's rent with a check drawn on the account of Rosen Import Company. On January 12, 1978, Bruce Duncan & Co., customs house brokers in Atlanta, Georgia, received a call from the Delta Airlines Airfreight Office [Delta] at Hartsfield International Airport in Atlanta, advising that Delta was holding a shipment of sixteen cartons of lamps and brass table bases from Colombia, South America, and were consigned to Rosen Import Company. Having handled previous Rosen Import Company shipments, Bruce Duncan & Co. was familiar with Steagald as a representative of that company and therefore called to advise him that this shipment had arrived. Steagald requested that Bruce Duncan & Co. arrange for delivery of the shipment for the next day because "his customers needed the products." Bruce Duncan & Co., acting on information furnished by Steagald, contacted Theatres Service Company [TSC] regarding the delivery of the shipment. On January 14, 1978, after contact with both Delta and Steagald, TSC delivered sixteen crates to the warehouse at 100–D Mill Street. Steagald paid the freight charges with a Rosen Import Company check, signed for the shipment, and received a copy of the freight waybill as his receipt.

Steagald argues that the evidence produced is consistent with the innocent activities of an importer and that the government's evidence, by failing to place him inside the Buford, Georgia, house, fails sufficiently to prove knowledge and intent. However, the government's evidence also showed that during the search of the Buford, Georgia, house, the copy of the TSC freight waybill received by Steagald upon delivery of the sixteen crates to the Mill Street warehouse was discovered on the dining room table. Additionally, agents found in the house two blank Rosen Import Company checks bearing the next two consecutive numbers to that on the check used by Steagald to pay the TSC freight charges. The evidence further showed that Steagald, when taken into custody, was wearing only slacks and a long-sleeve shirt, clothing inconsistent with the coldness of the January afternoon, and that once taken inside the

Buford, Georgia, house, told a DEA agent that he was cold and requested that she get a sweater or coat for him from the kitchen area. Moreover, on January 20, DEA agents obtained a search warrant for the warehouse located at 100–D Mill Street. There, agents discovered numerous wooden crates that had been opened previously and a large number of lamps and brass table bases. All the brass table bases were hollow inside. During the search agents discovered a bag of white powder, subsequently determined to be 483 grams of cocaine, 70% pure, inside one of the brass table bases.

▪ The sufficiency of the evidence to establish Steagald's knowledge and intent must be viewed in the light most favorable to the government, *Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942), with all credibility choices considered in support of the jury verdict. *United States v. Barresi,* 601 F.2d 193, at 195 (5th Cir. Aug. 22, 1979); *United States v. Black,* 497 F.2d 1039 (5th Cir. 1974). Applying this standard, there was sufficient evidence to support the jury's verdict.

▪ Steagald further contends that the trial court committed reversible error when it failed to dismiss the indictment on grounds of double jeopardy. Steagald's first trial ended when, pursuant to his motion, the trial court declared a mistrial because of the publication of a prejudicial article in a local newspaper. Steagald claims that the prejudicial material in the article arose from a statement attributed to Gaultney and furnished to the press by the United States Attorney. Steagald argues that this action constitutes prosecutorial overreaching of such magnitude as to require application of the bar of double jeopardy. The law in this circuit was stated in *United States v. Kessler,* 530 F.2d 1246 (5th Cir. 1976);

> [U]nder ordinary circumstances, a defendant's request for a mistrial removes any constitutional barrier to retrial. . . But the Supreme Court recognizes that there may be exceptions to that rule— rare cases involving circumstances which

are "attributable to prosecutorial * * * overreaching," . . .

> Where "prosecutorial overreaching" is present, the interests protected by the Double Jeopardy Clause outweigh the public interest in conducting a second trial ending in acquittal or conviction. . .

. . . .

> To find "prosecutorial overreaching," the Government must have, through "gross negligence or intentional misconduct," caused aggravated circumstances to develop which "seriously prejudice[d] a defendant" causing him to reasonably conclude that a continuation of the tainted proceeding would result in a conviction.

530 F.2d at 1255–1256. This analysis must consider the totality of the circumstances prior to the mistrial in order to determine whether prosecutorial overreaching existed. *Id.* at 1256.

▪ Under *Kessler*'s test, the prosecutor's actions do not come close to prosecutorial overreaching. The record, as clarified by counsel during oral argument, shows that the transcript of Gaultney's statement that the prosecutor provided to the press contained no information that had not been introduced previously in the presence of the jury. Indeed, the United States Attorney's actions appear to have been motivated by a desire to ensure accuracy in the press's accounts. There was no error in the trial court's denial of Steagald's motion to dismiss the indictment on grounds of double jeopardy.

▪ Finally, Steagald contends that the trial court committed reversible error in its supplemental charge to the jury, first by refusing to recharge on specific intent and reasonable doubt and second by inaccurately defining intent by failing to refer to specific intent. A review of the supplemental charge to the jury, together with the court's original charge, discloses no error. The district court in its supplemental charge expressly cautioned the jury not to consider his supplemental charge in an iso-

lated context, but to consider the entire charge as given, ascribing no greater weight to the supplemental charge than to the original charge. In so doing, the district court took an appropriate and previously approved step to ensure a balanced charge so as to avoid any possibility of prejudice to the defendant. *United States v. Sutherland*, 428 F.2d 1152, 1157–58 (5th Cir. 1970), *cert. denied*, 409 U.S. 1078, 93 S.Ct. 698, 34 L.Ed.2d 668 (1972). Furthermore, the original and supplemental charges, when considered as combined charges, accurately cover the points of law at issue. *United States v. Blevins*, 555 F.2d 1236, 1239 (5th Cir. 1977), *cert. denied*, 434 U.S. 1016, 98 S.Ct. 733, 54 L.Ed.2d 761 (1978).

The convictions of Hoyt A. Gaultney and Gary K. Steagald are

AFFIRMED.

KRAVITCH, Circuit Judge, dissenting:

I respectfully dissent from that portion of the opinion relating to the entry and search of the premises.

*United States v. Cravero*, 545 F.2d 406 (5th Cir.), *cert. denied*, 430 U.S. 983, 97 S.Ct. 1679, 52 L.Ed.2d 377 (1977), permitted, without a search warrant, the entry of premises of a third party for execution of an arrest warrant, based upon the officer's *reasonable belief* that the subject of the arrest warrant was within the building. The court reasoned that despite a lack of exigent circumstances, an officer who has already been to the magistrate once to secure the arrest warrant need not make an additional trip if he has determined that the

suspect is within certain premises. 545 F.2d at 421.

In *Cravero* the officers personally had observed the subject enter the dwelling and, after maintaining surveillance for several hours, reasonably concluded that the subject was still within the house. Here, however, we are confronted with a different factual situation. The arresting officer had not observed Ricky Lyons, the subject of the arrest warrant. His belief that Lyons was within the premises was based solely upon an informant's tip. The informant had not seen Lyons on the premises,[1] but had merely heard his voice in the background during a telephone call from Jimmy, Lyons' companion, who stated that he and Lyons were at the location of a given telephone number. After matching the telephone number with a residence,[2] the officers, without first applying to a detached magistrate for a search warrant, proceeded to the premises where they detained the defendants and, after entering and looking through the rooms, discovered not the subject of the arrest warrant, but a cache of cocaine. As in *Cravero* there was an arrest warrant but no exigent circumstances; unlike *Cravero* the evidence linking the subject to the premises was extremely fragile and insufficient to justify an entry without a search warrant.[3]

In *Adams v. Williams*, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972), the Supreme Court extended the *Terry* doctrine[4] to include a stop based not only on the policeman's observations but also on an informant's tip which did not satisfy the

---

1. Compare with *Rodriguez v. Jones*, 473 F.2d 599 (5th Cir.), *cert. denied*, 412 U.S. 953, 93 S.Ct. 3023, 37 L.Ed.2d 1007 (1973) where informant had observed the subject enter the building.

2. No address or name of resident was furnished by informant, but these were ascertained from the telephone company.

3. The circuits are not in accord on this issue. The Third Circuit, in *Government of Virgin Islands v. Gereau*, 502 F.2d 914, 928 (3rd Cir. 1974), *cert. denied*, 424 U.S. 917, 96 S.Ct. 1119, 47 L.Ed.2d 323 (1976), held: "Although police

have warrants for the arrest of suspects, they may enter premises, at least of third persons, to search for those suspects only in exigent circumstances where the police officers also have probable cause to believe that the suspects may be within." However, the Tenth Circuit, citing *Cravero* as authority, affirmed denial of a motion to suppress in a case factually similar to the case before us. *United States v. Harper*, 550 F.2d 610 (10th Cir. 1977), *cert. denied*, 434 U.S. 837, 98 S.Ct. 128, 54 L.Ed.2d 99 (1977).

4. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

*Aguilar-Spinelli* criteria.[5] *Adams* and *Terry* involved a minimal invasion of privacy, however, as compared with the greater intrusion occasioned by the search of a third party's private home. When an intrusion of such magnitude occurs, if not based upon the policeman's personal observation, nothing short of a full-fledged *Aguilar-Spinelli* tip should be acceptable.

Therefore, I would reverse the denial of the motion to suppress.

I concur with the remainder of the opinion relating to the other grounds of appeal.

---

**5.** *Spinelli v. United States,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969). *Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964).