OPINION OF THE COURT
Walter T. Gorman, J.
A suppression hearing was held on September 21 and 22, 1982. At this hearing the People called seven witnesses: New York State Police Investigator Stanley E. Weidman, New York State Police Investigator Robert D. Warner, New York State Police Trooper James L. Rogers, New York State Police Investigator Michael D. Byrne, New York State Police Trooper Mathew J. Porpilia, New York State Police Trooper Charles A. Stepneski and New York State Police Investigator Charles T. Brown. The defense called two witnesses: Russell Battaglia and the defendant himself.
*712 Based upon a careful consideration of the credible evidence presented at this hearing, the People’s posthearing memorandum of law and the applicable case law, the following findings of fact and conclusions of law are made.
FINDINGS OF FACT
On December 20, 1981, Investigators Weidman, Warner and Brown, investigating an assault of one'Darlene Hancock, learned from Ms. Hancock and from a Joan Harden-burgh that the alleged assailant, Russell Battaglia, was armed with a handgun and a shotgun. Battaglia had also told Hancock and Hardenburgh that he had been arrested before, that he would not be arrested again and would shoot the police who tried to take him and then shoot himself. Russell Battaglia was known by the investigators to carry weapons on occasion and to have a violent, assaultive personality.
An arrest warrant was sought and obtained from Town of Clay Justice Floyd E. Linn at approximately 11:00 a.m. on December 20, 1981. The investigators had learned earlier from Ms. Hancock that Battaglia had been with a friend named “Steve” (surname unknown), described as tall and skinny, who lived in the Hollyrood Park apartment complex. Ms. Hancock also described Russell Battagha’s car sufficiently to obtain a license plate number from viie police computer.
Patrols were sent to the Hollyrood Park complex where they located the car. It was parked in a lot across from building No. 33.
Investigators Weidman and Warner were contacted and they proceeded to the rental office for the apartment complex to ascertain if there was a “Steve” fitting the description given them.earlier registered in building No. 33. They learned from the rental agent that a Steven Atkinson, the defendant, lived in apartment No. 4 of building No. 33. The investigators also obtained from the rental agent a key to the garage section to enable them to enter building No. 33.
Two uniformed troopers, Rogers and Porpilia, were assigned the perimeter of the building. They remained outside while Investigators Brown, Warner and Weidman — all in civilian clothes — entered the building. Following *713 the investigators into the building were uniformed Troopers Stepneski and Byrne. Stepneski and Byrne entered with their weapons drawn.
Receiving no response to his first knock on the door of apartment No. 4, Investigator Weidman knocked again. Inside a voice said, “Who is there,” to which Investigator Weidman responded, “Open the door. It’s the management.” The door was then opened.
A quick interchange ensued between the police officers and the defendant who had opened the door. Russell Battaglia was spotted on the living room couch. The officers rushed through and Battaglia was immediately arrested and the area around him was thoroughly searched.
During the confusion the defendant is alleged to have moved toward his bedroom, possibly being pushed in that direction by the police officers attempting a quick, uneventful and safe arrest of Russell Battaglia. While at the bedroom doorway Trooper Stepneski spied a circular, metal object protruding from under the bed pillow. The trooper admitted during the hearing that although at that moment he did not know what the object was, he escorted the defendant into the bedroom, uncovered the object and discovered that it was a pistol.
The defendant was arrested and later he and Russell Battaglia were removed. Trooper Rogers was left behind to secure the apartment and await the return of his superiors so that a more thorough search pursuant to a warrant could be conducted. Later Trooper Rogers was relieved by Trooper Porpilia.
At approximately 6:30 p.m., after obtaining a search warrant, Investigators Brown, Weidman, Casey and Warner returned. A thorough search of the defendant’s apartment was conducted, revealing a veritable arsenal of weapons and ammunition and numerous hypodermic syringes and needles.
The defendant seeks suppression of all of the evidence seized from his apartment on December 20, 1981, alleging first that the entry into the apartment was illegal and that the evidence should be suppressed as tainted fruit, and second that even if the entry was proper the seizure was a *714 result of a search conducted prior to the time a warrant was obtained, as a result of which the later search became illegal and the evidence ultimately seized became tainted fruit of the poisonous tree.
CONCLUSIONS OF LAW
On the facts of this case it is unnecessary to address any issue beyond that raised by the initial entry. That is, was the entry proper under the circumstances?
Clearly the answer to this question is no. In Steagald v United States (451 US 204), the United States Supreme Court addressed this very issue[1] in a factual setting uncannily similar to that present in the instant case.[2] In that case it was held that absent exigent circumstances or consent a search warrant must be obtained prior to entry into the residence of a third party to search for the subject of an arrest warrant. (451 US, at pp 205-206.)
Two separate and distinct Fourth Amendment interests must be differentiated in a case such as this. First, the subject of the arrest warrant has an interest in being free from an unreasonable seizure. Second, the third party has an interest in being free from an unreasonable search of his residence. This latter interest was determinative in Steagald (451 US, at pp 212-214, supra), as it is determinative in the case at bar.
The Steagald court held that, except in certain exceptional circumstances, it is necessary to interpose a neutral *715 magistrate to protect both of these Fourth Amendment interests. (Steagald v United States, 451 US, at pp 212-215, supra.) Regarding the first interest, if an arrest warrant is obtained based upon probable cause, then the arrestee’s Fourth Amendment right to be free from unreasonable seizure is presumptively protected. However, the court held that obtaining the arrest warrant was insufficient to protect the second of the two Fourth Amendment interests. It is necessary except in limited circumstances to also obtain a search warrant. In so doing a neutral magistrate will make the determination that on the facts then known there is probably cause to believe the subject of the arrest warrant is located in the third party’s residence. (451 US, at pp 212-215, 214-215, n 7.) Further, the court reasoned that if such procedure is not followed there would be a great potential for abuse as the instant case so aptly illustrates. (451 US, at pp 215-216.)
The police officials in the case at bar were not armed with a search warrant for apartment No. 4, building No. 33, on December 20, 1981. Thus, unless either an exigent circumstance or consent existed, their entry into the defendant’s apartment was patently violative of the defendant’s Fourth Amendment rights and, therefore, all resulting evidence seized must be suppressed.
EXIGENT CIRCUMSTANCES
Neither in the Steagald decision, nor in its predecessor, Payton v New York (445 US 573, holding that the Fourth Amendment prohibits the police from making a warrant-less and nonconsensual entry into a suspect’s home to make a routine felony arrest),[3] did the Supreme Court explain what was meant by “exigent circumstances”. However, in the Payton decision the court did provide some guidance in this respect. While not citing the decision for this precise issue, the Payton court, as had an earlier court in Coolidgev New Hampshire (403 US 443, 481, n 36), cited the case of Dorman v United States (435 F2d 385), with approval. (445 US, at p 587.) In the Dorman case Judge Leventhal articulated seven factors which he found affect *716 the existence of “exigent circumstances” as that relates to the warrant requirement (435 F2d, at pp 392-393 and ns 16-21):
(1) that a grave offense is involved, particularly one that is a crime of violence;
(2) that the suspect is reasonably believed to be armed;
(3) that there exists not merely the minimum of probable cause, but beyond that a clear showing of probable cause, including “reasonably trustworthy information” to believe that the suspect committed the crime involved;
(4) that there is strong reason to believe that the suspect is in the premises being entered;
(5) that there is a likelihood that the suspect will escape if not swiftly apprehended;
(6) that the entry, though not consensual, is made peaceably; and
(7) that the entry is made during daylight hours.
Many courts have cited the Dorman case, utilizing its factors to test the constitutionality of a warrantless entry into a defendant’s residence to effect his arrest. (See, e.g., People v Martin, 50 NY2d 1029, 1031, n 2; People v Payton, 45 NY2d 300, 322 [Cooke, J., dissenting], revd 445 US 573; People v Jones, 108 Misc 2d 574, 577-578; see, also, 2 La Fave, Search and Seizure, § 6.1, pp 388-390, ns 68-75,1982 Pocket Part, pp 106-107.) The Dorman decision, however, is not without controversy — it has been labeled “impractical” and “confusing”. (See, e.g., Donnino & Gírese, Exigent Circumstances for a Warrantless Home Arrest, 45 Albany L Rev 90, 99-106; Note, 1978 U of Ill L Forum 655, 678.) This criticism of the Dorman factors would seem well founded when some courts have succumbed to a mere counting of the factors satisfied in deciding the merits of the constitutional issue presented. (See, e.g., United States v Lindsay, 506 F2d 166; Commonwealth v Wagner, 486 Pa 548.)
As Professor La Fave stated in his treatise on search and seizure, “[t]he ultimate purpose of all Fourth Amendment standards is not to keep probative evidence out of criminal trials, but rather to keep police practices within constitu *717 tional limits * * * this purpose * * * not [being] served by a rule which cannot be applied with a fair degree of consistency by well-intentioned police officers.” (2 La Fave, Search and Seizure, § 6.1, p 390 and n 76.) Professor La Fave continues to suggest a solution to the formulation of a more “workable” standard. He suggests that the truly “planned” arrest be distinguished from the arrest “made in the course of an ongoing investigation in the field.” La Fave defines a “planned arrest” as “one which is made after a criminal investigation has been fully completed at another location and the police make a deliberate decision to go to a certain place * * * in order to take him into custody.” (Id., at p 391.)
The preferable approach would seem to be a combination of both the La Fave approach and the Dorman factors to determine whether “exigent circumstances” existed to justify warrantless police actions. What results is a reasonableness approach; that is, whether it was reasonable under all of the circumstances to delay in effectuating an arrest while a search warrant is obtained.
Even the question of the delay occasioned by obtaining a warrant may be unimportant in light of the Payton and Steagald decisions (supra). In the Payton case the dissenting Justices noted that the increased likelihood of escape resulting from the delay could be reduced by staking out all possible exits until the circumstances become clearly exigent or until a warrant is obtained. (445 US, at p 619, supra.) The majority in the Steagald decision clearly subscribes to the same theory. (See 451 US, at p 221 and n 14, supra.)
In the case at bar the People argue that a clear, exigent circumstance existed, i.e., that Russell Battaglia was an armed and highly volatile personality and was a danger to the police officers in particular and the community in general. While this may have in fact been the case, it would seem that obtaining a search warrant would be precisely the method to prevent any added danger which may have resulted from actions such as they used. In particular, had they had probable cause to believe that *718 Russell Battaglia was truly at the defendant’s apartment,[4] coupled with the information regarding the weapons he possessed and the threats he had made, this should have formed an adequate basis for a no-knock search warrant. Additionally, if the police were concerned about Battaglia’s escape they easily could have staked out the defendant’s apartment, waited for the “inherent mobility” of Battaglia to lead him outside into a public place and then arrest him pursuant to the warrant they already had.
Clearly then, if there was an exigency present, which is not entirely obvious from the facts presented, it was one which was foreseeable at the time the decision was made to enter the defendant’s apartment, at a time when a warrant could have been obtained. (See 2 La Fave, Search and Seizure, § 6.1, p 391 and n 82.)
Under these facts the police actions were exactly the evil the court’s decision in Steagald v United States was intended to prevent. (See 451 US, at p 215.)
Therefore, no exigent circumstances being found or proved by the People in this case, the question of whether there was consent for the entry must be considered.
CONSENT
In Bumper v North Carolina (391 US 543, 548-550), the United States Supreme Court stated that:
“[w]hen a prosecutor seeks to rely upon consent to justify the lawfulness of a search, he has the burden of proving that the consent was, in fact, freely and voluntarily given. This burden cannot be discharged by showing no more than acquiescence to a claim of lawful authority * * * .
“When a law enforcement officer claims authority to search a home under a warrant, he announces in effect that the occupant has no right to resist the search. The situation is instinct with coercion — albeit colorably lawful *719 coercion. Where there is coercion there cannot be consent.” (Emphasis added.)
The court later stated, in Schneckloth v Bustamonte (412 US 218, 227), that “the question whether a consent to search was in fact Voluntary’ or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances.”
The circumstances arising in the instant case are precisely those which the courts in Bumper and Schneckloth sought to eradicate. The police entered the defendant’s apartment through deception, saying that they were “the management”. Once inside at least 2 of the 5 troopers brandished their weapons in the face of the defendant who was clad only in a pair of pants and had quite clearly been sleeping. A more coercive atmosphere cannot be imagined.
Even if the People’s theory of the case is accepted — that the police entered, calmly explained who they were and that they had an arrest warrant for Russell Battaglia — this is an improper basis for consent. (Bumper v North Carolina, supra.) Even if such had been the true sequence, which is unlikely based on the credible evidence presented at the hearing, a “consent” would have been invalidated as being involuntarily given. (See United States v Jones, 641 F2d 425, 429-430.)
Quite clearly then the situation was “instinct with coercion” and, therefore, cannot be consent.
All of the evidence seized in this case was found as a result of the police officers’ presence in a place where they were not entitled to be. All of the evidence, therefore, becomes fruit of a poisonous tree, i.e., the illegal entry, and must be suppressed. As severe a result as this seems, it is necessary. The citizenry must be protected from unreasonable police intrusions into the sanctity of their homes by requiring the independent determination of need — probable cause — by a judicial officer. Anything less would work a denial of Fourth Amendment rights. And any violation of these fundamental rights demands severe results. (See People v Payton, 45 NY2d, at p 323, supra [Cooke, J., dissenting].)

. The court framed the issue as follows: “whether, under the [flourth [ajmendment, a law enforcement officer may legally search for the subject of an arrest warrant in the home of a third party without first obtaining a search warrant.” (Steagald v United States, 451 US 204, 205.)

. In Steagald a Drug Enforcement Administration (DEA) agent was first contacted by a confidential informant in early January of 1978. The informant claimed to know the location of one Ricky Lyons who the DEA agent later learned was the subject of a Federal fugitive warrant. The informant again contacted the DEA agent later in January, giving the phone number at the house where Lyons was allegedly staying. The phone number was traced and a few days later 12 DEA agents drove to the address to search for the fugitive. Not finding Lyons outside they entered the house, searched it not finding the man they sought but observing what they believed to be cocaine. In a series of three searches, the final one pursuant to a properly obtained search warrant, 43 pounds of cocaine was seized and the defendant petitioner, Gary Steagald, was arrested. (Steagald v United States, 451 US, at pp 206-207.)

. The court in Payton specifically declined to address the issue presented in Steagald v United States (Payton v New York, 445 US, at p 583).

. From the facts presented, even if a search warrant had been sought and obtained prior to the police officers’ entry, it would have been struck down as not based upon sufficient evidence to amount to probable cause. At most the information possessed by the police here amounted to a “suspicion” that Russell Battaglia was in the defendant’s apartment (see Steagald v United States, 451 US, at p 215), and even so, not even a “reasonable suspicion”.