Allen HODGE, Petitioner,

v.

Robert HENDERSON, Superintendent,
Auburn Correctional Facility,
Respondent.

No. 87 Civ. 3800 (KTD).

United States District Court,
S.D. New York.

July 27, 1990.

Lincoln Square Legal Services, Inc., New York City, Fordham University School of Law for petitioner; James A. Cohen, Beth G. Schwartz, Jeanette M. Samra and Magda S. Vives, Legal Interns, of counsel.

Robert M. Morgenthau, Dist. Atty., New York County, New York City, for respondent; Mark Dwyer and Donald J. Siewert, Asst. Dist. Attys., of counsel.

## MEMORANDUM AND ORDER

KEVIN THOMAS DUFFY, District Judge.

Petitioner Allen Hodge seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254 (1982). Hodge is currently a New York State prisoner serving an indeterminate prison term of fifteen years to life upon conviction of robbery in the first degree. The sentence was imposed by the Supreme Court, New York County (Fraiman, J.) after a trial by jury. On appeal, the Appellate Division, First Department, affirmed Hodges' conviction and sentence without opinion. The New York Court of Appeals then denied leave to appeal.

Hodge appears to have fully exhausted his state remedies as required by *Rose v. Lundy*, 455 U.S. 509, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982). He now seeks this petition on the grounds that: (1) he was denied his constitutional right to self-representation; (2) the court failed to suppress his lineup identification; (3) police testimony improperly bolstered the prosecution case; (4) he was precluded from exercising his right to appear and testify before the grand jury; (5) the prosecutor threatened his alibi witness; (6) the court precluded Hodge from contesting the constitutionality of his prior convictions; (7) ineffective assistance of counsel and (8) the court improperly instructed the jury on (a) the intent element of Robbery in the First Degree and the instruction that the People were not required to prove that the gun Hodge displayed was real; (b) Hodge's alibi defense; and (c) "interested witnesses."

I deal in this Memorandum and Order with each of Hodge's claims in detail in the hope that this will be the end of his many lawsuits.

## FACTS

At 10:30 p.m. on February 10, 1983, Hodge robbed Rafael Zorrilla, a gypsy cab driver, at gunpoint and stole Zorrilla's taxicab and other of Zorilla's personal property. On February 11, 1983, Hodge was ar-

rested.[1] At the lineup conducted on March 25, 1983, Zorrilla identified Hodge as the robber.

*Pre–Trial Proceedings*

Hodge was indicted by a grand jury for Robbery in the First Degree on April 27, 1983. At his arraignment in New York County on April 29, 1983, the court entered a plea of not guilty since counsel had not yet been appointed.

Although counsel was later appointed, on June 23, 1983, the court relieved Hodge's counsel, who requested to be relieved and against whom Hodge had filed a complaint with the bar association. The court stated: "You are going to end up representing yourself, but I'm going to give you one more attorney." Transcript ("Tr.") 2.

Subsequently, Saul Kobrick was appointed as new counsel. At a calendar call on September 7, 1983, the following took place before Justice Haft (who was not the trial judge):

THE DEFENDANT: Your Honor, I haven't received none of my papers, disclosure, my indictment.

THE COURT: Your lawyer has it. That's why he's a lawyer.

THE DEFENDANT: I've been asking him and the lawyer before. I haven't received none of my papers.

What's going on?

[DEFENSE COUNSEL]: Your Honor, just for the record, on August 16, I sent a letter to Mr. Hodge at the Bronx House of Detention where I indicated I just received the papers from his former attorney and enclosed copies of the voluntary disclosure form, indictment and the motion that was made on his behalf by his former—

THE DEFENDANT: I have received nothing.

THE COURT: You didn't get the papers that your lawyer just said—

THE DEFENDANT: I have been arrested since February 11.

THE COURT: Listen to what he said.

THE DEFENDANT: That's not good enough.

THE COURT: That's all the papers that you are going to get.

THE DEFENDANT: Just get him off my case then. *I'll represent myself.*

PROSECUTOR: Your Honor, A.D.A. Consuelo Fernandez has this case.

THE COURT. Let's put it on for the same date, September 13.

THE DEFENDANT: For the record then, I don't want this lawyer.

THE COURT: That application is denied. If you don't have—

THE DEFENDANT: Just railroad me. I don't care.

THE COURT: Did you or did you not receive—

THE DEFENDANT: I did not receive my former attorney's papers nor his papers. He says it. He says what he did.

THE COURT: I should not believe what he says.

THE DEFENDANT: I don't believe what he's doing, period. I [am] just submitting a motion. There has been no announcement—

THE COURT: You can't submit your own motion. You cannot submit your own motion when you're represented by counsel. You have to give—

THE DEFENDANT: He has to adopt it.

THE COURT: But did you give it to him?

THE DEFENDANT: I handed—

THE COURT: [Defense counsel] will look at it and if he thinks it should be submitted—

[SECOND PROSECUTOR]: Adjournment by consent?

THE COURT: No, I'm not relieving—

---

**1.** Hodge was arrested in Bronx County on charges unrelated to the incident on February 10, 1983. He was subsequently convicted in Bronx County of assault, robbery, and possession of a weapon. On December 6, 1983, Hodge was sentenced to a term of imprisonment of 20 years to life after the trial judge determined him to be a persistent violent felony offender pursuant to N.Y. Penal Law § 70.10. That determination was based on Hodge's 1963 conviction for attempted Assault in the Second Degree and two 1967 convictions for Robbery in the First Degree and Robbery in the Second Degree, respectively.

THE DEFENDANT: *I would like to represent myself.*

THE COURT: No, you've had two lawyers already. This is the second lawyer. There is no sufficient reason to and you're not going to have another lawyer.

[DEFENSE COUNSEL]: Your Honor, just for the record, Mr. Hodge has taken back the papers that he wanted me to look at and has returned—

THE DEFENDANT: Well, if [he's] not going to visit me, I don't know what I'm going to do in thirty seconds, thirty-second representation, hello and good-bye. Tr. 3–6.

On October 25, 1983, Kobrick requested to be relieved as Hodge's attorney. The court, however, denied this request and continued Kobrick's representation. The court said, "[Since Hodge] hasn't asked to represent himself, I feel for me to require him [Hodge] to represent himself at this time would be error...." Tr. 3. On October 27, 1983, the court also denied Kobrick's renewed request to be relieved as Hodge's attorney. During the same calendar call, Kobrick informed the court that on September 20, 1983, Hodge had filed a written *pro se* application to act as counsel or co-counsel on his own behalf. Tr. 3.[2]

*Wade Hearing*

In the instant case, at counsel's request, the court granted Hodge a *Wade* hearing to determine whether, prior to the March 25, 1983 lineup, members of the police department showed Zorrilla any photographs of Hodge or employed any unduly suggestive procedures. Tr. 7. Officer Edward Coughlin of the 6th Precinct testified that on the night of February 10, 1983, Zorrilla went to the 6th Precinct and filed a complaint alleging that he had been robbed. Coughlin showed Zorrilla some photographs of persons who had been arrested to see if Zorrilla could identify the perpetrator. Hodge's photograph was not among those shown Zorrilla. Tr. 33–34. Zorrilla did not select any individual in the photographs shown to him. Before the lineup, Coughlin told Zorrilla that "there was a person arrested and we were not sure if it was the same person, that was the reason for having the lineup." Tr. 35–36, 39–40.

At the lineup, Coughlin did not recall whether he told Zorrilla that someone had been caught in the taxicab or that someone had been apprehended. Tr. 40. Coughlin testified further that it was possible that he told Zorrilla a gun had been recovered. Coughlin recalled informing Zorrilla that the car had been found, but did not recall mentioning whether any personal property had been recovered. Tr. 42.

Zorrilla testified that he never saw any photographs of Hodge prior to the lineup. He spoke to Coughlin concerning the date and time of the lineup and testified that the police told him, "that they already have the driver, the man who robbed me, they already have the car." Tr. 52. Therefore, Zorrilla expected that one of the men in the lineup was the robber. Tr. 52–53. Zorrilla identified Hodge at the lineup, Tr. 49–50, and again at the hearing. Tr. 51.

Defense counsel moved to suppress the lineup identification arguing that prior to the lineup, the police had informed Zorrilla that they had arrested the person who robbed him, and therefore, Zorrilla was in a frame of mind to pick a person included in the lineup. The court denied the motion, finding no undue suggestiveness. Tr. 54–55. Coughlin's statement to Zorrilla "that they had caught the person who had

---

**2.** Hodge had been through the state legal system before. In May of 1963, he pled guilty to assault in the Second Degree and was sentenced to an indefinite prison term. Soon after completing the 1963 sentence, Hodge was charged in two separate 1967 indictments. He pled guilty to Robbery in the First Degree and Robbery in the Second Degree. He was sentenced as a second felony offender to a minimum of 20 years for Robbery in the First Degree and from 15 to 20 years for Robbery in the second degree, the sentences to run concurrently. Most of the time between the 1967 convictions and the facts giving rise to his conviction here, Hodge spent in prison. Shortly after his arrest for a case related to the instant one, Hodge, as a matter of defense strategy filed a civil rights action against the arresting officers and the complaining witnesses. This court is filing today a Memorandum and Order disposing of one of those actions.

robbed him" did not taint an otherwise "perfectly valid" lineup identification. Tr. 55. Zorrilla had been shown no photograph of Hodge before the lineup, and there was no suggestion of any impropriety in the conduct of the lineup itself. Tr. 55. Hodge's trial began on March 6, 1984, immediately after the close of the hearing.

*Trial Proceedings*

People's Case

Zorrilla testified that on February 10, 1983, at approximately 10:30 p.m., while he was driving his cab, he picked up a man in the vicinity of Central Park West and 106th Street. Tr. 74. The man, who was carrying a guitar, was close to the cab and Zorrilla said that he had a good view of him. Tr. 77. The man requested that Zorrilla drive him to Greenwich Village to pick up four friends and continue on to a place where they would play music. Tr. 78, 106–11. The man requested to sit up front and Zorrilla did not object. Tr. 78–79, 110–11.

During their conversation, which lasted about fifteen seconds, the man stood just outside the driver's door of the cab, close enough for Zorrilla to touch him. Tr. 77, 79–80, 108–10. Zorrilla had an unobstructed view of his face and could see him "perfect[ly]." Tr. 78–79, 120. The man had a beard and mustache and wore a black jacket and black hat. Tr. 96–97, 99, 122. Zorrilla could see that his hair was "kinky" and "looked like when he go [sic] to the hair salon and they stretch it back." Tr. 97, 126. Zorrilla also looked at the man as he climbed into the front seat. Tr. 80, 111. However, the taxi's overhead light was not working. Tr. 139.

During the cab ride, the passenger, who claimed he was Jamaican, engaged in idle talk with Zorrilla. Tr. 83. However, Zorrilla stated that he was more concerned with his driving than with the passenger's conversation. Tr. 119. Zorrilla testified that at times, he glanced at the passenger but, at best, he only had a side view of him because he was paying attention to the road. Tr. 119.

Upon arriving at the corner of Greenwich and Jane Street in Greenwich Village, the passenger ordered Zorrilla to stop. The passenger exited the cab, took his guitar from the back seat, and re-entered the front seat of the cab. Zorrilla again glanced at the passenger and saw his face as he got back into the cab. Tr. 86. The area was illuminated by street lights. Tr. 140–41. The passenger then quickly pointed a gun at Zorrilla, Tr. 84, 138, and robbed him, ordering Zorrilla to take off his coat and get out of the cab. The man then drove the cab away. Tr. 89, 94–95, 121–22.

After the incident, Zorrilla went to the 6th Precinct and reported the robbery. He described the perpetrator to Coughlin as a black male, six feet tall, who spoke with a Jamaican or Haitian accent. Tr. 121–22. Zorrilla did not recall whether he told the police that the perpetrator had a moustache or a beard. Tr. 123. However, at trial, he testified that on the night of the robbery, the person who robbed him had a beard and a moustache, Tr. 97, 99, and wore a black jacket and a black hat which covered his forehead and the back of his head.

Officer Israel Colon testified that on the night of February 11, 1983, he and his partner, Officer Madelyn Ruperto, arrested Hodge. Hodge was seated in the driver's seat of a gypsy cab with one foot out the door and the engine in reverse, trying with the help of two other men to extricate the cab from a snowbank. Tr. 160–61, 177, 180, 192. Hodge was not wearing a coat. Tr. 172–73. The cab was Zorrilla's; it was blue-green and bore the same license plate and vehicle identification number. At trial, Colon identified photographs of Zorrilla's cab as depicting the vehicle in which he arrested Hodge. Tr. 72–73, 160–63.

Colon found a nine-millimeter Smith and Wesson semi-automatic pistol stuffed between the cushions in the front seat of the cab. Tr. 163–64, 167, 185–87. Colon also found a black hat and a black coat on the front seat of the cab. Tr. 168–70. Zorrilla identified the hat as the hat Hodge had worn during the robbery, but he did not recognize the coat. Tr. 97–98, 101. In the pockets of the coat, Colon discovered two sets of keys, one attached to a small flashlight, Tr. 170–71, 183–84, which Zorrilla

identified as the keys Hodge had taken during the robbery. Tr. 92–95. In conversation with Colon, Hodge did not speak with a Jamaican, Haitian, or Spanish accent. Tr. 181–82.

The Lineup

In March 1983, Coughlin called Zorrilla and asked him to view a lineup. Tr. 215. Coughlin told Zorrilla that his car had been found and someone had been arrested, and Zorrilla knew that the person who had been arrested would be in the lineup. Tr. 124–25. The lineup took place on March 25, 1983. There were five stand-ins in addition to Hodge, who was represented by counsel and selected the number three position. Tr. 200–01, 216–17. At the lineup, Hodge had no beard and only a "slight" moustache, and his hair was combed "straight back" in "a processed look." Tr. 202–03, 221.

Zorrilla studied the lineup for four or five seconds, Tr. 134–35, 218, and then identified Hodge, Tr. 100, 134–35, 216, recognizing him by his face. Tr. 125–26. Zorrilla also identified Hodge at the trial as the man he had picked up on Central Park West. Tr. 75.

Defense Case

Hodge did not take the stand. Beverly Jones testified that she was Hodge's common law wife and had lived with him for the past seven years. Tr. 268. At approximately 8:30 a.m. on the morning of February 10, 1983, Hodge left their apartment to look for a job and returned at about 6:30 p.m. Jones remembered this day in particular because she and Hodge were celebrating their one-year old daughter's first step. Tr. 270.

Jones testified that on that evening, Hodge and her son wrestled and played Monopoly. After dinner, she and Hodge went to bed at approximately 9:15 p.m. until the next morning. Jones got up to feed her daughter between 10:00 and 10:30 p.m. When she returned to bed at approximately 10:50 p.m., Hodge was already asleep. Tr. 273. She testified that Hodge was still there when she woke up the next morning. Tr. 273–74.

The next day, at approximately 8:45 a.m., Hodge left the apartment with Jones' son, stating he was going to look for a job. Tr. 274. Jones testified that Hodge never returned home that evening. Jones further testified that on February 11, 1983, Hodge wore a long navy blue coat and no hat. Moreover, Jones testified that Hodge mostly owned long sport coats and some light-colored wide-brimmed hats. Tr. 283–84.

Jones further testified that on February 10 and 11, 1983, Hodge had an afro, a moustache, and a little goatee. Tr. 289. However, since the time of his arrest, he had shaved off his moustache and goatee, and then grew it back again. Tr. 299. She never saw Hodge with a guitar and he never mentioned that he performed with other individuals. Tr. 289–90. She testified that Hodge had worked at the San Carlos Hotel, but not while he was living with her, and that he never left for work from her apartment. Tr. 293–95.

Jury Charge

The court instructed the jury about how to weigh the witness' testimony. The court gave the following alibi charge:

Now, this defense is sometimes referred to as an alibi defense. Alibi is a latin word which means elsewhere and in law it means a defense interposed by a defendant in which he contends at the time in question he was at some other place than where the crime was committed.

Now, as I said, Miss Jones testified that during the entire night of February 10th the defendant was at home with her on 118th Street. Now, if the evidence as to the alibi raises a reasonable doubt in your mind as to whether the person who robbed Mr. Zorrilla is the defendant, then the defendant is entitled to the benefit of that doubt and to acquittal.

The defendant is not obligated to establish that it was impossible, by reason of his having been somewhere else, for him to have committed the crime charged. If you accept the testimony of the alibi witness but still conclude that it may have been possible for the defendant to have committed the crime charged, it is

still for you to determine whether he availed himself of that possibility.

Now, if the proof as to alibi, when taken into consideration with all the other evidence in the case, raises a reasonable doubt as to the defendant's guilt, he is entitled as I have indicated to an acquittal.

However, if you are satisfied beyond a reasonable doubt that the defendant was in the company of Mr. Zorrilla at the time of the robbery on February 10, then you must determine whether he is guilty of the crime charged in the indictment, that is whether each of the elements of the crime of robbery in the first degree have been satisfied.

Tr. 372–73

### Verdict and Sentencing

Hodge was found guilty of Robbery in the First Degree. Tr. 385–86. The prosecutor informed the court that Hodge had been adjudicated a persistent violent felony offender at a hearing held on December 6, 1983, before Judge Grey of Supreme Court, Bronx County. Tr. 389. Prior to the sentencing hearing, the prosecutor submitted a certified copy of that transcript. The trial court relied on the findings made by Judge Grey and sentenced Hodge on April 11, 1984, to a term of imprisonment of 15 years to life to run consecutively to his Bronx sentence, which he was then currently serving. Sentence Hearing ("S.") 35–36. The court acknowledged that it did not follow the prosecutor's recommendation of imposing concurrent sentences. S. 37.

### Hodge's Appeal

Hodge, through appointed appellate counsel Joel B. Atlas, appealed his conviction to the New York State Supreme Court, Appellate Division, First Department. He argued, first, that his conviction should be reversed because he had been denied his rights to testify before the grand jury and to represent himself at trial. Hodge also argued that the court had improperly admitted Zorrilla's lineup identification as well as police testimony about the lineup which "bolstered" Zorrilla's identification. Further, Hodge maintained that the prose-

cutor deprived him of a fair trial by intimidating his alibi witness, and that the court had erred in charging the jury with respect to interested witnesses, the intent element of Robbery in the First Degree, the People's obligation to establish that the pistol was real, and Hodge's alibi defense. Finally, Hodge contended that he had been improperly deprived of an opportunity to contest his status as a persistent violent felony offender. Brief for Defendant–Appellant, Exh. 2 at 15–32; Appellant's Supplemental Brief, Exh. 3 at 13–15.

On February 3, 1987, the Appellate Division affirmed Hodge's conviction unanimously and without opinion. On February 20, 1987, Hodge moved *pro se* for reargument and reconsideration of his appeal, alleging for the first time that he had been deprived of effective assistance of counsel at the trial. Notice of Motion and Affidavit, Exh. 6. On May 5, 1987, the Appellate Division summarily denied reconsideration. Exh. 7.

Hodge sought leave to appeal to the New York Court of Appeals, arguing by counsel that the trial court had improperly rejected his request to represent himself. Atlas Letter, February 25, 1987, Exh. 9. In a *pro se* supplemental application, Hodge again asserted that he had been deprived of effective assistance of counsel in the trial court. Notice of Application for Leave to Appeal, Exh. 10. On April 1, 1987, Hodge's leave application was denied by the Court of Appeals.

### DISCUSSION

#### I. Hodge's Request to Proceed *Pro Se*

Hodge first claims that he was deprived of his constitutional right to represent himself. He alleges that his applications to proceed *pro se* were timely, unequivocal, and without any evidence of "gamesmanship."

The Constitution guarantees a criminal defendant the right to proceed *pro se*. *Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). Although the Sixth and Fourteenth Amendments guarantee the right to effective as-

sistance of counsel, the Constitution does not force a lawyer upon a defendant. *Id.* at 815, 95 S.Ct. at 2531. Indeed, denial of the right to proceed *pro se*, once asserted, requires the automatic reversal of a criminal conviction and is not subject to harmless error analysis. *Johnstone v. Kelly*, 808 F.2d 214, 218 (2d Cir.1986), *cert. denied*, 482 U.S. 928, 107 S.Ct. 3212, 96 L.Ed.2d 699 (1987).

Because an accused relinquishes many of the traditional benefits associated with the right to counsel when he decides to represent himself, he must declare his desire to proceed *pro se* "clearly and unequivocally." *Faretta*, 422 U.S. at 835, 95 S.Ct. at 2541. In addition, the accused must knowingly and intelligently waive his right to counsel, so that the record will establish that " 'he knows what he is doing and his choice is made with eyes open.' " *Id.* at 835, 95 S.Ct. at 2541 (quoting *Adams v. U.S. ex rel. McCann*, 317 U.S. 269, 279, 63 S.Ct. 236, 242, 87 L.Ed. 268 (1942)). "In other words, a trial judge must determine whether a defendant genuinely means what he says." *Wiesner v. Abrams*, 726 F.Supp. 912, 919 (S.D.N.Y.1989). In addition,

> all federal courts construe the Constitution to require a defendant to effectively waive his right to counsel before being granted the right to self-representation. While the practice varies as to the form of warnings and waiver language, there is no question that actions and words sufficient to demonstrate a knowing and intelligent waiver of the right to counsel are deemed essential.

*Tuitt v. Fair*, 822 F.2d 166, 176 (1st Cir. 1987), *cert. denied*, 484 U.S. 945, 108 S.Ct. 333, 98 L.Ed.2d 360 (1987).

Indeed, unlike other constitutional rights, "the right to be one's own counsel can easily be overlooked or waived if a defendant does not properly invoke the right or inadvertently waives it through some procedural misstep." *Dorman v. Wain-*

*wright*, 798 F.2d 1358, 1365–66 (11th Cir. 1986), *cert. denied*, 480 U.S. 951, 107 S.Ct. 1616, 94 L.Ed.2d 801 (1987). Considering the "strong presumption against waiver of the right to counsel, such a stringent standard for judging the adequacy of an assertion of the right of self-representation, involving as it does a waiver of the right to counsel, is entirely appropriate." *United States v. Weisz*, 718 F.2d 413, 425–26 (D.C. Cir.1983), *cert. denied*, 465 U.S. 1034, 104 S.Ct. 1305, 79 L.Ed.2d 704 (1984).

Similarly, under New York law, a defendant in a criminal case may invoke the right to defend *pro se* provided: "(1) the request is unequivocal and timely asserted, (2) there has been a knowing and intelligent waiver of the right to counsel, and (3) the defendant has not engaged in conduct which would prevent the fair and orderly exposition of the issues." *People v. McIntyre*, 36 N.Y.2d 10, 324 N.E.2d 322, 327, 364 N.Y.S.2d 837, 844 (1974) (noting that defendant's right to proceed *pro se* is not absolute).

■ Initially confining this inquiry to the character of the assertion itself, and not subsequent developments, I find that Hodge's request to proceed *pro se* was not unambiguously stated. Hodge relies primarily on his statements at a calendar appearance before Justice Haft on September 7, 1983, six months before the trial. In context, Hodge's statements could reasonably be interpreted, and apparently were interpreted by the judge, to be merely expressions of annoyance and frustration with counsel's purported failure to transmit the papers in the case. After this outburst, Hodge never again indicated that he wished to represent himself. Rather, on September 30, 1983, he filed a written motion "to act as co-counsel" at his trial, with an affidavit declaring that he would "be represented at said trial by [a] practicing attorney" and stating his "intention to fully cooperate with this attorney." Exh. 12.[3]

---

**3.** It is worth noting that a defendant may not engage in "hybrid" representation by acting as co-counsel with either a court-appointed attorney or with his own attorney. *McKaskle v. Wiggins*, 465 U.S. 168, 183, 104 S.Ct. 944, 953, 79

L.Ed.2d 122 (1984), *reh'g denied*, 465 U.S. 1112, 104 S.Ct. 1620, 80 L.Ed.2d 148 (1984). The decision to permit a defendant to proceed as co-counsel rests in the sound discretion of the trial court. *Cross v. United States*, 893 F.2d

Subsequently, on October 25, 1984, in a colloquy in Hodge's absence, Kobrick moved to be relieved as counsel because of "difficulties" and "hostility" he experienced "communicating with" Hodge. Justice Haft rejected that application as a "ploy and a delaying tactic," stating:

> There is no other recourse I have, unless the defendant has [sic—asks?] to represent himself. He hasn't asked to represent himself. I feel for me to require him to represent himself at this time would be error, therefore, without reason I am going to continue your representation.
>
> If the defendant chooses to simply rely upon you as an advisor and wants to try the case himself, that will be a matter for the trial justice to determine....

Tr. 2–3.

It is evident from this exchange that Hodge's purported attempt to waive his right to counsel and assume his own defense was not asserted clearly and unequivocally before Justice Haft, who apparently would have entertained a request by Hodge to proceed *pro se* if Hodge so requested. I do not find it unusual for a defendant particularly when incarcerated, to become disenchanted with counsel, appointed or otherwise, and when a request for judicial action is rejected, angrily declare that he'll then represent himself. Nor do I find it surprising that Justice Haft did not interpret Hodge's fit of pique to be a genuine, serious assertion of his right of self-representation and concomitant waiver of right to counsel. *See People v. Payton*, 45 N.Y.2d 300, 408 N.Y.S.2d 395, 402, 380 N.E.2d 224, 231 (1980), *rev'd on other grounds*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). (defendant's statements as to proceeding *pro se* were associated with reference to discharging his assigned attorney and did not evince an "ac-

tual fixed intention and desire" to self-representation).

Moreover, considering the context of Hodge's purported assertion of the right to proceed *pro se*, the trial judge need not have immediately assumed that Hodge's frustration with his counsel constituted a clear and unequivocal expression of Hoge's right to self-representation. Because the Supreme Court has enjoined courts to "indulge in every reasonable presumption against wavier" of the right to counsel, *Brewer v. Williams*, 430 U.S. 387, 404, 97 S.Ct. 1232, 1242, 51 L.Ed.2d 424 (1977), *reh'g denied*, 431 U.S. 925, 97 S.Ct. 2200, 53 L.Ed.2d 240 (1977), a court "should not quickly infer that a defendant unskilled in the law has waived counsel and has opted to conduct his own defense." *Brown v. Wainwright*, 665 F.2d 607, 610 (5th Cir. 1982); *see also United States v. Smith*, 778 F.2d 925 (2d Cir.1985) (waiver of the right to counsel under the Sixth Amendment is to be measured by stricter standards than similar waivers under the Fifth Amendment).

The instant circumstances are unlike those in *Faretta*, where the Supreme Court found that "weeks before trial, Faretta clearly and unequivocally declared to the trial judge that he wanted to represent himself and did not want counsel. The record affirmatively shows that Faretta was literate, competent, and understanding, and that he was voluntarily exercising his informed free will." 422 U.S. at 835, 95 S.Ct. at 2541. *Cf. Dorman*, 798 F.2d at 1367 (wish to proceed pro se "rings out loud and clear" from the record). Nor is this a situation where the trial judge denied a request to proceed *pro se* on the ground that the defendant "lacked the 'requisite education, background, training or experience.'" *Johnstone*, 808 F.2d at 216.[4]

---

1287, 1292 (11th Cir.1990) (no *Faretta* violation where clear and unambiguous request to proceed *pro se* was later clarified as seeking permission to act as co-counsel).

**4.** One court has held that the fact that a defendant may have been dissatisfied with earlier appointed counsel is not a basis for discrediting

his request to proceed without counsel on the morning of trial. *Wiesner*, 726 F.Supp. at 919. In that instance, however, the court expressly found that the trial judge's concerns with the petitioner's lack of lawyering skills were "clearly material" to denial of the request for self-representation. *Id.* at 918.

When, as here, a trial judge is faced with a difficult situation that developed during the pre-trial stage of the prosecution and culminates in a defendant's request to represent himself, there is a thin line between error in failing to recognize a proper assertion of the right to self-representation and error in sustaining an improper waiver of the right to representation by counsel. Indeed, the opportunity for defendants to invite error of constitutional proportions is vast.[5] On the record before me, I cannot say that it was unreasonable for the trial judge to fail to construe Hodge's outburst as an assertion of one constitutional right and concomitant waiver of another. When the right to counsel and the right to proceed *pro se* collide, it is reasonable to favor the right to counsel over the right to self-representation in that the former attaches automatically and has to be affirmatively waived to be lost whereas the latter does not attach until it is asserted. *Brown*, 665 F.2d at 610; *Tuitt*, 822 F.2d at 174; *United States v. Weisz*, 718 F.2d 413. The consequences of being deprived of counsel are far more serious than those of not being allowed to proceed uncounselled. *Tuitt*, 822 F.2d at 174.

Moreover, even if Hodge's conduct could be construed as constituting an assertion of the *Faretta* right, subsequent occurrences formed the basis of a waiver of the right. Hodge did not persist in his desire to appear *pro se* and it was not reasserted unambiguously before Justice Fraiman at trial. Unlike the right to counsel, the right to self-representation can be waived by failure to timely assert it, or by subsequent conduct giving the appearance of uncertainty. *See Brown*, 665 F.2d at 611 (right may be waived through defendant's subsequent conduct indicating he is vacillating on the issue or has abandoned his request altogether). In *Brown*, for example, although the defendant notified the court prior to trial that he preferred to represent himself, he later waived his right to self-representation by permitting appointed counsel to conduct his defense and by not asserting a desire to represent himself until late in the trial. Indeed, a court need not conduct a hearing or otherwise confront the defendant about his desire to proceed *pro se* if by conduct subsequent to the invocation of his right the defendant appears to be vacillating on his decision. *Id.* at 612; *see also Weisz*, 718 F.2d at 425–26 (defendant's request to represent himself with assigned counsel or stand-by counsel other than his currently assigned counsel properly interpreted by court as a request for substitution of counsel).

It seems clear on the record that Hodge abandoned his request; he made it only once, during an angry outburst, and did not refer to it again. *Cf. Dorman*, 798 F.2d at 1367 (no reasonable person could deny that defendant wanted to proceed *pro se* where he cited *Faretta* in several written request to trial judge and began civil proceedings against public defender in order to create conflict of interest and allow defendant to defend himself). This claim is therefore dismissed.

## II. Procedural Bar

At the outset, the state claims that Hodge is procedurally barred from raising the following claims: (1) that Officer Coughlin's trial testimony about the lineup improperly bolstered Zorrilla's identification; (2) that the prosecutor unconstitutionally intimidated Hodge's alibi witness; and (3) that the charge to the jury was improper regarding the intent element of robbery in the first degree, Hodge's alibi defense, and the interested witness charge. Pursuant to *Harris v. Reed*, 489 U.S. 255, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989), a procedural default in the state court does not bar consideration of a federal habeas claim if the state appellate court denying relief of the claim does not plainly state that review was barred on procedural grounds. The Second Circuit has stated that the *Harris* rule must be adhered to in reviewing all habeas petitions that come to federal court

---

5. Courts' fear "that a canny defendant may try to play one constitutional right against the other has been borne out in subsequent cases." *Tuitt*

*v. Fair*, 822 F.2d 166, 175 (1st Cir.1987) (collecting cases), *cert. denied*, 484 U.S. 945, 108 S.Ct. 333, 98 L.Ed.2d 360 (1987).

after that decision. *Peterson v. Scully,* 896 F.2d 661 (2d Cir.1990) (*Harris* did not establish a "new rule" of constitutionally required procedure), *cert. denied,* —— U.S. ——, 110 S.Ct. 3301, 111 L.Ed.2d 810 (1990). Here, the Appellate Division affirmed Hodge's conviction without opinion. As such, these claims will be considered on the merits.

### III. Jury Instructions

Hodge claims that the trial court improperly charged the jury in several respects.

#### A. The alibi charge

■ Hodge contends that the state court's alibi instruction violated his right to a fair trial because it diluted the government's burden of disproving the alibi defense beyond a reasonable doubt. Specifically, Hodge claims that the court's alibi charge impermissibly suggested to the jury that Hodge had the burden of proving the truth of his alibi defense. He further claims that the trial judge did not tell the jury that it was the People's burden to disprove Hodge's alibi beyond a reasonable doubt.[6]

Hodge points to the portion of the trial court's alibi instructions that charged: "If the evidence as to the alibi defense raises a reasonable doubt in your mind as to whether the person who robbed Mr. Zorrilla is [Hodge], then [Hodge] is entitled to the benefit of that doubt and to acquittal." Tr. 372. The court further charged:

> If the proof as to alibi when taken into consideration with all the other evidence in the case, raises a reasonable doubt as to [Hodge's] guilt, he is entitled as I have indicated to an acquittal ... However, if you are satisfied beyond a reasonable doubt that [Hodge] was in the company of Mr. Zorrilla at the time of the robbery on February 10, then you must determine whether he is guilty of the crime charged in the indictment, that is, whether each of the elements of the crime of

robbery in the first degree have been satisfied.
Tr. 372–73.

The question on federal habeas review is not whether the instructions were undesirable, erroneous, or even universally condemned, but whether the instructions by themselves so affected the entire trial that the resulting conviction was violative of due process. *Wright v. Smith,* 569 F.2d 1188, 1191 (2d Cir.1978). The court must inquire whether the jury could reasonably have failed to understand, after hearing the trial judge's instructions as a whole, that the People bore the burden of disproving Hodge's alibi beyond a reasonable doubt. *Simmons v. Dalsheim,* 543 F.Supp. 729, 737–38 (S.D.N.Y.1982) (a state may not, consistent with due process, impose on a defendant any burden of persuasion with respect to an alibi defense), *aff'd,* 702 F.2d 423 (2d Cir.1983).

The alibi charge at issue here, considered in the context of the entire charge, did not shift to Hodge the burden of proving the alibi defense. Before reading the alibi instructions, the trial judge clearly charged the jury on the People's burden of proof. Tr. 367. Later, after the judge explained the principles relevant to the jury's evaluation of Zorrilla's identification, he charged the jury that "if after analyzing all the credible evidence in the case you come to the conclusion that the People have convinced you beyond a reasonable doubt that Mr. Zorrilla has accurately and correctly identified the defendant as the person who robbed him" they might accept Zorrilla's identification and give it what weight they saw fit. Tr. 371. Thus, it is unlikely that a juror hearing these instructions could fail to realize that the People bore the burden of proving that Hodge was the robber, which necessitated proving that Hodge was at the scene of the robbery and not at the location specified in his alibi defense.

The instructions did not imply that the alibi evidence must be "true" or must be "believed" by the jury before it could serve

---

**6.** The New York Court of Appeals has held that the trial judge must unequivocally state the People's burden when charging the jury as to an alibi defense. *See People v. Victor,* 62 N.Y.2d 374, 465 N.E.2d 817, 477 N.Y.S.2d 97 (1984).

as the basis for a reasonable doubt, the language criticized as burden-shifting in *Simmons.* Rather, the jury was charged to acquit if the alibi evidence, considered together with the other evidence in the case, "raises a reasonable doubt in your mind as to whether the person who robbed Mr. Zorrilla is the defendant." The jurors were instructed not even to consider the elements of robbery unless "satisfied beyond a reasonable doubt that the defendant was in the company of Mr. Zorrilla at the time of the robbery." As in *Wright,* the trial court made numerous references here to the People's burden of proof. While the charge did intimate that the evidence could "raise" a reasonable doubt of Hodge's guilt, that alone does not warrant habeas relief in light of the charge in its entirety. *Compare Simmons,* 543 F.Supp. at 739 (improper to suggest that alibi can prevail only if it "raises" a reasonable doubt) *with Wright,* 569 F.2d at 1188 n. 6 (proper to instruct jury to acquit "if, after consideration of all the evidence in the case, you have a reasonable doubt as to whether the defendant was present at the time and place the alleged offense was committed").

Moreover, the fact that Hodge failed to submit a proposed alibi charge and to object to the charge as given is relevant to the assessment of the charge on its merits. *Henderson v. Kibbe,* 431 U.S. 145, 154, 97 S.Ct. 1730, 1736, 52 L.Ed.2d 203 (1977) ("It is the rare case in which an improper instruction will justify reversal of a criminal conviction in which no objection has been made in the trial court."); *Victory v. Bombard,* 570 F.2d 66, 69 n. 2 (2d Cir.1978) (errors in jury instructions rarely rise to constitutional level). In contrast, in the *Simmons* case, upon which Hodge heavily relies, the defense counsel had timely objected at trial to the alibi instruction. The *Simmons* court expressly distinguished its facts from cases where a petitioner had failed to make timely objection and thus where courts "reviewed the charge under a standard significantly less favorable to the petitioner" than in that case. 543 F.Supp. at 747.

Even if the court's alibi charge unconstitutionally shifted the burden of proof to

Hodge, the instructions must be viewed as a whole to determine whether they affected the resulting conviction. *Wright,* 569 F.2d at 1191. Jury instructions that shift to the defendant the burden of proving his alibi defense have been held by the Second Circuit to constitute harmless error. *Id.* In light of the overwhelming evidence of Hodge's guilt, including Zorrilla's unequivocal identification of Hodge at the lineup and in court, whatever error occurred was clearly harmless. Moreover, Hodge's alibi was weak; it came from an interested witness whose testimony conflicted with other witnesses on numerous matters. Thus, Hodge's right to a fair trial was not impinged and this claim is dismissed.

### B. Interested witness charge

■ Hodge next claims that the court's charge with regard to interested witnesses was misleading and prejudicial as it was directed only at Hodge's witness. Given the circumstances, however, it was not unfair for the court to charge that Jones, as Hodge's "common law wife," is "what we call an interested witness, that is she is interested in the outcome of the case." Tr. 365. The court instructed the jury to apply the "same tests" in evaluating the witnesses' credibility as they would employ in everyday dealings, Tr. 361–62, including consideration of "the interest or lack of interest of any witness in the outcome of the case, the bias or prejudice of a witness if there is any ... motive that the witness may have in telling anything but the truth." Tr. 362.

Indeed, the record reveals that the court properly addressed the possibility that Zorrilla and the police officers were also interested witnesses, and left the subject of the witness' possible interest within the jury's province. The court specifically charged that a "police officer as a witness is no better or no worse than any other witness in the case," and told the jury not to accept the officers' testimony until they had "checked and tested it in precisely the same ways as you would [that] of any other witness." Tr. 364. The court added that the jury should use the "same yardstick" in evaluating the officers' credibility

as they would apply to any other witness, and not give "greater probative value to the testimony of a police officer merely because of his employment." As to Zorrilla, the jury was instructed that they might consider whether Zorrilla had "any motive to state anything but the truth" in identifying Hodge as the robber. Tr. 370. In light of these instructions, Hodge's claim is baseless and is dismissed.

### C. Robbery charge

█ Hodge next contends that the court's charge with respect to the robbery count was defective in two respects: (1) the court did not inform the jury that the People had to establish the element of intent beyond a reasonable doubt, and (2) the court erred when it instructed the jury that the pistol displayed did not have to be a real pistol.[7]

█ Hodge does not challenge the trial court's definition of the mental elements of robbery, but contends that the court improperly failed to instruct the jury that the People were required to establish them beyond a reasonable doubt. However, it is clear from a reading of the entire charge that the jury was well apprised of the People's burden of proof and that the People were required to establish intent, and all the elements of robbery, beyond a reasonable doubt. The court instructed the jury at least three times, in the context of defining the mental elements of the crime, that the jurors had to be satisfied beyond a reasonable doubt that Hodge "stole" Zorrilla's cab and other property, and that he did so "forcibly." Tr. 373–74. Moreover, the court instructed the jury several times in the course of the charge that it was the People's burden to establish Hodge's guilt beyond a reasonable doubt, and that this burden extended to "each of the elements necessary to constitute the crime charged," Tr. 366, 368–69; the court specifically

charged that the People's burden extended to each element of Robbery in the First Degree. Tr. 373–75. In any event, the evidence conclusively established both Hodge's larceny and his use of force. This claim is therefore dismissed.

█ Hodge further contends that the trial judge erred by instructing the jury that the People were not required to prove that the pistol Hodge used in this case was real, thereby "depriving" Hodge of the possibility of conviction of the lesser charges of Robbery in the Second or Third Degree. The court charged the jury that, if they were satisfied that Hodge had stolen the cab and other property from Zorrilla:

> you must determine whether he also displayed an object which appeared to be a pistol during the course of the robbery. Now, as to this element, it's not necessary that the People prove that what was used was actually a real pistol. It's only necessary that the defendant displayed what appeared to be a pistol.

Tr. 374–75.

Under New York Penal Law, a defendant may be convicted of Robbery in the First Degree if, in addition to the other elements of the crime, the People establish beyond a reasonable doubt that he "display[ed] what appear[ed] to be a pistol." N.Y. Penal Law § 160.15(4). On its face, the statute does not require that the gun be real. A defendant may establish, as an affirmative defense, that the object he displayed was not an operable firearm, and thereby obtain a reduction to Robbery in the Second Degree. However, absent evidence supporting that affirmative defense, as here, the People are not obliged to prove that the gun was real. It need only be established that the object displayed could reasonably be perceived as a pistol, and that the victim did in fact perceive it as such. *See Farrell v. Czarnetzky*, 566 F.2d 381, 382 (2d Cir.1977),

---

7. The state contends that this claim is unexhausted because Hodge never argued to the state courts that the trial court's charge with regard to the pistol violated his federal constitutional rights. I disagree. Hodge fairly presented this issue to the state court in his Supplemental Brief to the Appellate Division, Exh. 3, to which the state's attorneys responded. Even if

the case cited by Hodge, *People v. Smith*, 85 Misc.2d 1, 380 N.Y.S.2d 569 (1976), which employed constitutional analysis in a like fact situation, has been overturned, it adequately informed the state court of the constitutional nature of Hodge's claim. Accordingly, this claim is exhausted for the purposes of federal habeas review.

*cert. denied,* 434 U.S. 1077, 98 S.Ct. 1268, 55 L.Ed.2d 783 (1978); *People v. Baskerville,* 60 N.Y.2d 374, 381, 457 N.E.2d 752, 469 N.Y.S.2d 646 (1983). Accordingly, the court's charge was proper. Moreover, the evidence at trial made plain that Hodge's gun was real, and Zorrilla testified that its distinctive squared-off appearance "looked like" the gun used in the robbery.[8] In any event, this is a matter purely of state law and does not rise to constitutional dimensions. As such, this claim is without merit and is dismissed.

### IV. Line-up Identification

Hodge further contends that the trial court's failure to suppress the lineup identification, obtained after Zorrilla was told that the man who was found in the stolen cab would be in the lineup, violated his due process right to a fair trial.

The state court held a limited *Wade* hearing to determine whether Zorrilla had seen photographs of Hodge before the March 23, 1983 lineup and whether any unduly suggestive action was taken prior to the lineup.[9]

Due process protects against the admission of evidence deriving from suggestive identification procedures. Courts must consider whether (1) a very substantial likelihood of irreparable "misidentification" exists; and (2) whether "the totality of the circumstances" surrounding the identification supports the reliability of the identification despite the suggestive confrontation procedure. *Neil v. Biggers,* 409 U.S. 188, 198–99, 93 S.Ct. 375, 381–82, 34 L.Ed.2d 401 (1972). In determining the likelihood of misidentification, the trial court should consider the opportunity of the witness to

view the defendant at the time of the crime and the witness' degree of attention, the accuracy of the witness' prior description of the perpetrator, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation. *Id.* at 199–200, 93 S.Ct. at 382.

Both Officer Coughlin and Zorrilla testified at the hearing. Coughlin testified that he told Zorrilla before the lineup that "there was a person arrested and we were not sure if it was the same person, that was the reason for having the lineup." Tr. 35–36, 39–40. Coughlin further testified that he told Zorrilla that the car had been found, but did not recall if he mentioned that personal property had been recovered, and stated that he may have told Zorrilla that the gun had been recovered. Tr. 42. Zorrilla testified at the hearing that the police told him that "they already have the driver, the man who robbed me", and that he had realized in advance that the robber would appear in the lineup. Tr. 52–53. Justice Fraiman found that, even assuming the police had made the statement to which Zorrilla had testified, the statement did not "taint what was otherwise a perfectly valid lineup and identification." Tr. 55.

Plainly, Coughlin's statement to Zorrilla did not create a substantial likelihood of irreparable misidentification. As a threshold matter, it is implicit in the viewing of a lineup that a suspect might appear; this knowledge alone is insufficient to pose a substantial likelihood of misidentification. *See Brayboy v. Scully,* 695 F.2d 62, 65 (2d Cir.1982), *cert. denied,* 460 U.S. 1055, 103 S.Ct. 1505, 75 L.Ed.2d 934 (1983); *Tavarez v. LeFevre,* 649 F.Supp. 526, 531 (S.D.N.Y.

---

**8.** Significantly, Hodge did not contend at the trial that the gun had not been real. Rather, he attempted to show that he had not been involved in the robbery at all and had not possessed the gun, pointing to Officer Colon's failure to have the gun examined for fingerprints. Tr. 188–89.

**9.** The *Wade* hearing was considered "limited" because it did not address the "independent source" and the procedural aspects of the lineup. Justice Fraiman denied Hodge's request for a "full" *Wade* hearing, observing that there was no indication of any impropriety at the lineup,

and that the lineup was presumptively regular because Hodge had been represented by counsel. Tr. 5, 8. Both Hodge's first appointed attorney and Hodge himself had submitted motions to suppress Zorrilla's identification, but neither had alleged any impropriety in the lineup. Absent any allegation by Hodge that the lineup itself had been improperly conducted, limiting the *Wade* hearing to events before the lineup was proper under N.Y.Crim.Proc.Law § 710.60(1) and (3) (allegations required to entitle defendant to *Wade* hearing).

1986). Moreover, such information does not predispose the viewer of the lineup to select any particular person when the lineup, as here, was otherwise proper. *Sales v. Harris,* 675 F.2d 532, 538 (2d Cir.1982), *cert. denied,* 459 U.S. 876, 103 S.Ct. 170, 74 L.Ed.2d 140 (1982).

■ Furthermore, the totality of the circumstances surrounding Zorrilla's identification of Hodge strongly support its reliability. Zorrilla had ample opportunity during the robbery to observe the perpetrator clearly and fully at very close range. Zorrilla's prolonged contact with the robber, and particularly the final moments of the encounter when the robber brandished a gun, searched Zorrilla, and removed his wallet and coat, enabled Zorrilla to make an accurate and unequivocal identification at the lineup six weeks later. In addition, there was compelling corroboration for Zorrilla's identification in Officer Colon's account of Hodge's arrest the night after the robbery. *See, e.g., United States v. Reid,* 517 F.2d 953, 967 (2d Cir.1975) ("other evidence connecting a defendant with the crime may be considered on the issue whether there was a substantial likelihood of misidentification"). Colon found Hodge in Zorrilla's cab. Inside the cab, Colon found a gun, which Zorrilla swore looked like the one used in the robbery, and a hat, which Zorrilla identified as the robber's. In addition, Hodge's jacket pocket contained two sets of keys taken from Zorrilla.[10]

From the record it is therefore clear that the lineup was not unduly suggestive and Zorrilla's identification was reliable. Accordingly, this claim is without merit and is dismissed.

10. Hodge relies on the fact that, on the Complaint Report drawn up on the night of the incident and based on Zorrilla's description, the box for "facial hair" was left unchecked. Hodge, at the time of his arrest, had both a beard and a moustache. At trial, Zorrilla testified that the robber had a beard and a moustache. On cross-examination, Zorrilla testified that he gave Coughlin a complete description of the robber, Tr. 145, and that he did not recall whether he told the police about the robber's

### V. Bolstered Testimony

■ Hodge claims that Coughlin's testimony about the lineup improperly bolstered Zorrilla's identification. Specifically, Hodge points to Coughlin's direct testimony that he had conducted the lineup, that there had been six participants including Hodge, that they were seated, each given numbers, and that Hodge wore number three. Tr. 199–201. Hodge argues that this testimony served only to confirm Zorrilla's identification and thus improperly bolstered that identification because it had no independent probative value. This claim does not rise to constitutional dimensions, but I will consider the merits in any event.

Coughlin did not "bolster" Zorrilla's identification, in the sense of repeating it for the jury, until after Hodge's counsel had elicited detailed testimony about the identification on Zorrilla's cross-examination. Tr. 216. On direct, Zorrilla did not describe the lineup, except to note that the stand-ins had worn numbers and that Hodge had worn number three. Tr. 99–100. Hodge's counsel cross-examined Zorrilla in detail about the line-up and pre-lineup procedure, Tr. 124–27, 134–37, in what can fairly be viewed as implying that the lineup had been suggestive, thereby opening the door to responsive testimony from the police officer in charge. Moreover, Coughlin's account of the lineup procedure helped the jury assess the weight and credibility of Zorrilla's identification and therefore had relevance apart from any "bolstering" effect. This claim is therefore without merit and is dismissed.

### VI. Prosecutorial Misconduct

■ Hodge further claims that the prosecutor intimidated Hodge's alibi witness, Beverly Jones. Before Jones took the stand, the prosecutor informed the

facial hair. Tr. 123. *Cf. Manson v. Brathwaite,* 432 U.S. 98, 116, 97 S.Ct. 2243, 2254, 53 L.Ed.2d 140 (1977) ("[j]uries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature"). In the instant case the pretrial lineup was proper and Zorrilla was able to describe to the police the perpetrator's approximate height, weight, age, skin tone, and clothing.

court that Kobrick, Hodge's attorney, had been advised to inform Jones of the consequences of perjury and that if Hodge were convicted the District Attorney's Office would seek a perjury indictment against Jones. Kobrick told Justice Fraiman that the prosecutor came "storming over" as he was conferring with Jones and "started shouting and intimidating" both Kobrick and Jones, telling Jones, "If you testify I am going to ... indict you for perjury and I am going to get you in trouble." Tr. 252, 253. The prosecutor denied that she had threatened the witness. Tr. 254, 256. She asserted that she had addressed Kobrick, not the witness, and she denied saying "I am going to get you in trouble" or "I am going to indict you." Tr. 253, 255–56.

Justice Fraiman stated that conviction after the trial would by itself be an insufficient basis for charging Jones with perjury and he reprimanded the prosecutor for saying otherwise in her presence. Tr. 253–56. He asked Kobrick what he wanted to do, and Kobrick replied, "In light of what's transpired, I would like to speak to the witness and see if she is willing to testify." Tr. 257. After a short recess, Kobrick reported that Jones chose to testify, and she took the stand. Tr. 267. There was no further mention of the incident.

Hodge now contends that the prosecutor's conduct obstructed his alibi defense and deprived him of a fair trial by intimidating Jones and impairing her ability to testify clearly and without fear. However, the record does not indicate that Jones' testimony was impaired in any way by the prosecutor's actions, and Hodge does not point to any omission of fact or misstatement made by Jones as a result of the prosecutor's conduct. Indeed, at trial Hodge did not object or request relief from the court on the grounds that the prosecutor had obstructed his alibi defense or deprived him of a fair trial. Nor did he contend at that time that Jones had testified uncleanly, forgetfully, or contrary to the facts.

In a federal habeas corpus proceeding, "the relevant question is whether the prosecutor['s] comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Dar-*

*den v. Wainwright,* 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986), *reh'g denied,* 478 U.S. 1036, 107 S.Ct. 24, 92 L.Ed.2d 774 (1986) (quoting *Donnelly v. DeChristoforo,* 416 U.S. 637, 643, 94 S.Ct. 1868, 1871, 40 L.Ed.2d 431 (1974)). Even if the prosecutor's actions in this instance were ill advised, the trial and resulting conviction were by no means fundamentally unfair. *Cf. Mills v. Scully,* 826 F.2d 1192 (2d Cir. 1987) (prosecutor's failure to correct a witness's false testimony does not rise to the level of a constitutional violation unless there is a reasonable likelihood that the uncorrected testimony affected the jury's judgment or otherwise influenced the outcome of the trial). Hodge has not demonstrated that the prosecutor's conduct rose to the "egregious" standard which is necessary to constitute a due process violation. *See Donnelly,* 416 U.S. 637, 94 S.Ct. 1868. Accordingly this claim is dismissed.

## VII. Right to Appear and Testify Before Grand Jury

Hodge did not appear before the grand jury in this case and now claims that the prosecution's failure to allow him to do so, as provided by N.Y.Crim. Proc.Law § 190.50(5)(a), violated due process. Hodge further asserts that the trial court's failure to appoint an attorney to represent him at his arraignment on the indictment on April 29, 1983, and the inaction of two attorneys later appointed to represent him, prevented him from asserting his right to testify before the grand jury, or moving to dismiss the indictment within five days of his arraignment, constitutes denial of due process and effective assistance of counsel.

Since Hodge did not testify at trial, there is no indication of what testimony he may have offered that would have preempted the Grand Jury's indictment. In addition, on the basis of the overwhelming evidence at trial of Hodge's guilt, it is highly unlikely that Hodge's appearance before the Grand Jury would have made a difference in the Grand Jury's finding of probable cause. Thus, the prosecution's failure to allow Hodge to appear before the Grand Jury constitutes harmless error well beyond a reasonable doubt. Moreover,

Hodge was not arrested in New York County and held for the action of a New York County Grand Jury. Rather, he was arrested in Bronx County and was detained there on Bronx County charges from the night of his arrest until December 6, 1983, when he was sentenced there. Hodge, as a "non-arrest" case, was therefore not entitled to notice of the New York County Grand Jury proceeding. N.Y.Crim. Proc.Law § 190.50(5)(a). Because Hodge has shown no prejudice, no constitutional right has been implicated. *See Saldana v. New York*, 850 F.2d 117, 119–21 (2d Cir. 1988), *cert. denied*, 488 U.S. 1029, 109 S.Ct. 836, 102 L.Ed.2d 968 (1989).

### VIII. Ineffective Assistance of Counsel

■ Hodge's additional claims of ineffective assistance of counsel are also without merit. Specifically, Hodge contends that he was denied effective assistance of counsel because Kobrick (1) stated at a calendar appearance that he was "confused" about the case because a number of papers were missing from the file; (2) failed to obtain a transcript of arresting Officer Colon's testimony at the Bronx proceeding to show that Colon was an "interested witness" at Hodge's New York County trial; (3) failed to request an interested witness charge which would not be directed solely to Hodge's alibi witness, and failed to object to the charge actually delivered; and (4) did not interview any witnesses or tell Hodge who would testify at the trial.

Hodge has demonstrated neither that his counsel's representation was so deficient as to violate the Sixth Amendment nor that his defense was prejudiced. *See Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), *reh'g denied*, 467 U.S. 1267, 104 S.Ct. 3562, 82 L.Ed.2d 864 (1984). Moreover, Hodge's claims are belied by the record and fall below constitutional purview. Accordingly, I do not find that counsel's purported errors were so serious as to deprive Hodge of a fair trial.

### IX. Contesting Constitutionality of Prior Convictions

■ On December 6, 1983, Judge Grey of the Supreme Court, Bronx County, de-termined that Hodge was a persistent violent felony offender pursuant to N.Y. Penal Law § 70.10. This finding was based on three prior felony convictions, one in 1963 and two in 1967. Here, the trial court, relying on Judge Grey's findings, sentenced Hodge to a term of imprisonment of 15 years to life to run consecutive with the sentence for the Bronx County convictions. Hodge claims that the fact that his same prior felonies were used to adjudicate him as a persistent violent felony offender once and then later again to enhance his sentence upon a new conviction is fundamentally unfair and violates due process and the double jeopardy clause of the United States Constitution. Hodge, however, had his day in court on the issue of his status as a persistent violent felony offender, and there is no basis for relitigating that status now.

In sum, the petition for habeas corpus is in all respects denied and the complaint dismissed. Leave to appeal *in forma pauperis* is granted.

SO ORDERED.